# TIMELINE OF EVENTS – CAPT TERRY MORRIS, USN

| Date | Event |
|---|---|
| 2 Jun 15 | CAPT Terry Morris begins working at N00K, located at the CNA building at 3003 Arlington, Blvd, Arlington, VA. |
| 14 Sep 15 | Ms. Kurta receives "Meritorious Civilian Award" from the CNO. |
| 2 Oct 15 | Ms. Kurta receives her performance appraisal signed by CAPT Terry Morris, in which he states that she "exceeds expectations." |
| Oct 2015 – Mar 2016 | CAPT Terry Morris continually touches Ms. Kurta on shoulders, legs, back and lower back, and asks for hugs. He takes food directly from her lunches, leans over her while sitting at the computer and generally displays a lack of respect for personal boundaries. |
| ~ Mar 2016 | CAPT Terry Morris puts his hands inside the waistline of Ms. Kurta's pants, commenting on her weight loss. He ran his hands back and forth, and tugged on the pants. Ms. Kurta's belt fell to the floor and he bent over and slid it back up her body. |
| ~ Mar 2016 | The next day, Ms. Kurta confronts CAPT Morris about the incident. CAPT Morris tells her that he is the only person in the office who gets to say "no." |
| 18 Apr 16 | CAPT Morris attends SAPR training with the office. |
| 18 Apr 16 | Ms. Kurta and LCDR Nikitin discuss their shock at how well CAPT Morris did at the SAPR training and Ms. Kurta discloses the "pants incident" to LCDR Nikitin. |
| 3 May 16 | CNA has a fire alarm evacuation. On the way back into the building, CAPT Morris touches Ms. Murcia's right breast. LCDR Nikitin witnesses the incident and sees Ms. Murcia throw her elbow back with some force as CAPT Morris passes Ms. Murcia. |
| June 2016 | A preliminary command investigation of N00K is initiated due to allegations of poor command climate and sexual harassment. CAPT Sharon Ruesi, USN, is assigned as the preliminary investigator. |
| 28 Jun 16 | Maria Kurta, CIV is interviewed as part of the preliminary command investigation. |
| 29 Jun 16 | LCDR Shelby Nikitin, USN is interviewed as part of the preliminary command investigation. |
| 5 Jul 16 | Maria Kurta, CIV is interviewed as part of the preliminary command investigation. |
| 6 Jul 16 | CDR Curt Larson, USN is interviewed as part of the preliminary command investigation. |

| | |
|---|---|
| 6 Jul 16 | LCDR James Raymond, USN is interviewed as part of the preliminary command investigation. |
| 11 Jul 16 | Dr. Maren Leed interviewed as part of the preliminary command investigation. |
| 11 Jul 16 | CAPT Terry Morris, USN is interviewed as part of the preliminary command investigation. |
| 13 Jul 16 | LCDR Shelby Nikitin is interviewed as part of the preliminary command investigation. |
| 13 Jul 16 | Maria Kurta, CIV is interviewed as part of the preliminary command investigation. |
| 13 Jul 16 | CAPT John Springett, USN provides a memo for the record for the preliminary command investigation. |
| 14 Jul 16 | Maria Kurta, CIV is interviewed as part of the preliminary command investigation. |
| 21 Jul 16 | Estella Murcia interviewed as part of the preliminary command investigation. |
| 25 Jul 16 | NCIS assumes investigative authority and begins their investigation. |
| 26 Jul 16 | NCIS interviews Susan Adams, CIV, who is Estella Murcia's supervisor. |
| 26 Jul 16 | NCIS verifies the dates of the fire alarm evacuation at CAN. |
| 24 Aug 16 | NCIS interviews CDR Christopher Mullen, USN. |
| 24 Aug 16 | NCIS interviews Maria Kurta, CIV. |
| 26 Aug 16 | NCIS interviews LCDR Shelby Nikitin, USN. |
| 8 Sep 16 | NCIS interviews CAPT John Springett, USN. |
| 13 Sep 16 | Estella Murcia participates in the photo identification by NCIS to identify CAPT Morris. |

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

REPORT OF INVESTIGATION (INTERIM)                                    26JUN17

SEXUAL ASSAULT - ADULT (II)                    CONTROL: 25JUL16-DCWA-0248-8SNA

S/MORRIS, TERRY SCOTT/CAPT USN
  M/B/NOO6/T/264892199/07MAY65/FORT LAUDERDALE, FL
V/MURCIA, GLADYS STELLA/CIV
  F/W/USXX/N/699053640/13NOV60/BOGOTA, COLOMBIA
V/KURTA, MARIA VIDRO/CIV
  F/W/GS11/T/565537710/16JUN67/LOS ANGELES, CA

COMMAND/OPNAV/00011

MADE AT/DCWA/RESIDENT AGENCY WASHINGTON DC/JOSEPH BRUMMUND,
SUPERVISORY SPECIAL AGENT

REFERENCE(S)
(A) NCIS Resident Agency Washington DC ROI INTERIM (Contains
    Exhibits 1-18)/19SEP16
(B) NCIS Resident Agency Washington, DC ROI INTERIM (Contains
    Exhibits 19-20)/27SEP16
(C) NCIS Resident Agency Washington, DC ROI INTERIM/19NOV16
(D) NCIS Resident Agency Washington DC ROI INTERIM(Contains
    Exhibit 21)/29JAN17
(E) NCIS Resident Agency Washington, DC ROI INTERIM/31MAR17

EXECUTIVE SUMMARY
1. This reactive investigation pertains to suspected violation(s) of the
Uniform Code of Military Justice (UCMJ) Article 120 (Abusive Sexual Contact)
and Commonwealth of Virginia Criminal Code 18.2-67.4 (Sexual Battery). On
25Jul16, NCIS Resident Agency Washington, D.C. was notified by CDR Steven R.
OBERT, JAGC USN, Legal Advisor to the Director, Office of the Chief of Naval
Operations (OPNAV), that during the course of a command inquiry into poor
command climate and allegations of sexual harassment perpetrated S/MORRIS,
Executive Director to the CNO Executive Panel (N00K), V/MURCIA and V/KURTA
reported S/MORRIS touched them for the purposes of sexual gratification
without their consent. V/MURCIA and V/KURTA participated in interviews which
were audio/video recorded and copies of same were entered into the NCIS
Resident Agency Washington, D.C. evidence custody system. All incidents
occurred at the CNA building located at 3003 Washington Boulevard,
Arlington, VA; however, Arlington County, VA Police Department (ACoPD) ceded
primary investigative jurisdiction to NCIS with an offer of assistance if
needed. V/MURCIA confirmed that a man employed by the US Navy brushed her
right ribcage area and the lower part of her right breast as he was passing
her on his way into the building's foyer after a fire drill. V/MURCIA
believed this man's intentions were sexual because of the way he looked at
her; she subsequently identified S/MORRIS via photographic line-up. She was
provided a Victim Witness Assistance Pamphlet (VWAP) and did not desire a
Military Protective Order (MPO). As a civilian, V/MURCIA is not entitled to
a Victim's Legal Counsel (VLC) nor a Victim Advocate (VA) provided by the

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.

Department of Defense (DoD). Inquiries with Beth BOROWSKI, CIV, Director,
Real Estate and Facility Management, CNA, revealed the CNA building had a
fire alarm activation on 03May16. V/KURTA disclosed S/MORRIS perpetrated
several acts of sexual harassment and abusive sexual contact against her
during her approximately year-long employment as his Executive Assistant,
circa 2015-2016. V/KURTA stated the aforementioned occurrences of sexual
harassment culminated in an incident in early 2016 wherein S/MORRIS put his
hands inside the waistline of her pants commenting on her weight loss. When
S/MORRIS ran his hands back and forth inside her waistband and tugged on her
pants, V/KURTA's adjustable belt fell to the floor. S/MORRIS bent over and
slid the belt back up V/KURTA's body, touching her legs and thighs; he then
put the belt back in place at her waist, touching the bare skin of her
stomach with his hand in the process. A MPO was issued to S/MORRIS
precluding his contact with V/KURTA and V/KURTA was provided a VWAP. V/KURTA
declined the services of VLC and VA. Sexual Assault Forensic
Examinations (SAFEs) were considered in this case for both V/KURTA and
V/MURCIA but were not done due to the nature of the offense and the time
elapsed between the date of the offense. S/MORRIS was interviewed and
elected to exercise his rights to remain silent and to consult with an
attorney. This investigation was transferred to SA Janise BUCKMON on
14Dec16. On 22Dec16, Dr. Maren LEED, Civilian, was interviewed and provided
limited knowledge of the alleged sexual assaults. All investigative activity
is complete. On 08Jun17, LT Andrea M. LOGAN, USN, JAGC, USN, Trial Counsel,
NDW Region Legal Services Office (RLSO) and Capt Roy UNDERSANDER, USN, Chief
of Staff, Naval District Washington were updated. On 26Jun17, Capt. William
M. TRIPLETT, USN, Executive Assistant, OPNAV was updated on the status of
this investigation. This investigation is pending RLSO and Naval District
Washington administrative and/or judicial action.

NARRATIVE
1. This reactive investigation pertains to suspected violation(s) of Article
120 (Abusive Sexual Contact) of the Uniform Code of Military Justice (UCMJ)
and Commonwealth of Virginia Criminal Code 18.2-67.4 (Sexual Battery).

2. Reference (D) noted this investigation is pending administrative/or
judicial action. On 08Jun17, LT Andrea M. LOGAN, USN, JAGC, USN, Trial
Counsel, NDW Region Legal Services Office (RLSO) and Capt Roy UNDERSANDER,
USN, Chief of Staff, Naval District Washington were updated. LT LOGAN
advised a Board of Inquiry hearing would be scheduled during July, 2017.
The status of this investigation was provided to SA Michael MCLEAN, NCIS
Senior Rep to the OPNAV. On 26Jun17, Capt. William M. TRIPLETT, USN,
Executive Assistant, OPNAV was updated on the status of this investigation.
This investigation is transferred to Inv. Steve Ghezzi.

DISTRIBUTION
NCISHQ:23B2
INFO  :DCWA/OPNAV (Capt. Triplett, EA) (E)/RLSO (LT. LOGAN)
       (E)

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

REPORT OF INVESTIGATION (INTERIM)                                    16SEP16

SEXUAL ASSAULT - ADULT (II)              CCNTROL: 25JUL16-DCNA- 24E 8507.

S/MORRIS, TERRY SCOTT/CAPT USN
   W/E/NO06/T/304092199/07MAY65/FORT LAUDERDALE, FL
V/MURCIA, GLADYS STELLA/CIV
   F/W/USXX/N/699051640/13NOV60/BOGOTA, COLOMBIA
V/KURTA, MARIA VIDPO/CIV
   F/W/GS11/T/565517710/16JUN67/LOS ANGELES, CA

COMMAND/OPNAV/00011

MADE AT/DCNA/RESIDENT AGENCY WASHINGTON DC/RACHEL NCGRANAGHAN,
SPECIAL AGENT

EXHIBIT(S)
(1) IA: Receipt of draft reports of preliminary command
    inquiry/28Jul16
(2) IA: Results of interview of V/MURCIA/03Aug16
(3) IA: Results of crime scene documentation pertaining to
    V/MURCIA's allegation/26Jul16
(4) IA: Consideration of Sexual Assault Forensic Examination
    (SAFE) for V/MURCIA/06Sep16
(5) IA: Results of interview with Susan ADAMS, CIV/28Jul16
(6) IA: Receipt of false alarm dates from Beth BOROWSKI,
    CIV/26Jul16
(7) IA: Results of contact with Maria KURTA, CIV/11Aug16
(8) Military Protective Order for V/KURTA/12Aug16
(9) IA: Results of interview with LCDR Shelby McDonald MIKITIN
    USN/23Aug16
(10) IA: Results of interview with LCDR Christopher James
    MULLEN, USN/24Aug16
(11) IA: Results of interview of V/KURTA/25Aug16
(12) IA: Consideration of Sexual Assault Forensic Examination
    (SAFE) for V/KURTA/06Sep16
(13) IA: Results of Database Inquiries for V/KURTA/06Sep16
(14) IA: Results of interview with CAPT John SPRINGETT
    USN/12Sep16
(15) IA: Results of Digital Photographic Lineup Support/25Aug16
(16) IA: Results of identification of S/MORRIS by V/MURCIA via
    photographic line-up/13Sep16
(17) IA: Results of crime scene documentation pertaining to
    V/KURTA's allegation/16Sep16
(18) IA: Review of the Official Military Personnel File (OMPF)
    of CAPT Terry S. MORRIS, USN/11Aug16

EXECUTIVE SUMMARY
1. This reactive investigation pertains to suspected violation(s) of the
Uniform Code of Military Justice (UCMJ) Article 120 (Abusive Sexual Contact)

FOR OFFICIAL USE ONLY

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(IES) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE
## CONTROL:25JUL16-DCWA-0248-8SNA

**19SEP16**

and Commonwealth of Virginia Criminal Code 18.2-67.4 (Sexual Battery). On 25Jul16, NCIS Resident Agency Washington, D.C. was notified by CDR Steven R. OBERT, JAGC USN, Legal Advisor to the Director, Office of the Chief of Naval Operations (OPNAV), that during the course of a command inquiry into poor command climate and allegations of sexual harassment perpetrated S/MORRIS, Executive Director to the CNO Executive Panel (NOOF), V/MURCIA and V/KURTA reported S/MORRIS touched them for the purposes of sexual gratification without their consent. V/MURCIA and V/KURTA participated in interviews which were audio/video recorded and copies of same were entered into the NCIS Resident Agency Washington, D.C. evidence custody system. All incidents occurred at the CNA building located at 3003 Washington Boulevard, Arlington, VA; however, Arlington County, VA Police Department (ACoPD) ceded primary investigative jurisdiction to NCIS with an offer of assistance if needed. V/MURCIA confirmed that a man employed by the US Navy brushed her right ribcage area and the lower part of her right breast as he was passing her on his way into the building's foyer after a fire drill. V/MURCIA believed this man's intentions were sexual because of the way he looked at her; she subsequently identified S/MORRIS via photographic line-up. She was provided a Victim Witness Assistance Pamphlet (VWAP) and did not desire a Military Protective Order (MPO). As a civilian, V/MURCIA is not entitled to a Victim's Legal Counsel (VLC) nor a Victim Advocate (VA) provided by the Department of Defense (DoD). Inquiries with Beth BOROWSKI, CIV, Director, Real Estate and Facility Management, CNA, revealed the CNA building had a fire alarm activation on 03May16. V/KURTA disclosed S/MORRIS perpetrated several acts of sexual harassment and abusive sexual contact against her during her approximately year-long employment as his Executive Assistant, circa 2015-2016. V/KURTA stated the aforementioned occurrences of sexual harassment culminated in an incident in early 2016 wherein S/MORRIS put his hands inside the waistline of her pants commenting on her weight loss. When S/MORRIS ran his hands back and forth inside her waistband and tugged on her pants, V/KURTA's adjustable belt fell to the floor. S/MORRIS bent over and slid the belt back up V/KURTA's body, touching her legs and thighs; he then put the belt back in place at her waist, touching the bare skin of her stomach with his hand in the process. A MPO was issued to S/MORRIS precluding his contact with V/KURTA and V/KURTA was provided a VWAP. V/KURTA declined the services of VLC and VA. Sexual Assault Forensic Examinations (SAFEs) were considered in this case for both V/KURTA and V/MURCIA but were not done due to the nature of the offense and the time elapsed between the date of the offense and the reporting of same to law enforcement. Database inquiries were conducted for S/MORRIS, V/KURTA and V/MURCIA. S/MORRIS' Official Military Personnel File (OMPF) was reviewed, and the locations in the CNA building where the alleged offenses occurred were documented. This investigation has been briefed to, and coordinated with, LT Nicholas INNS, JAGC USN, NDW Region Legal Services Office (RLSO), Angela LAKEY, Sexual Assault Response Coordinator (SARC) and CDR Steven OBERT, JAGC USN, Legal Advisor to the Director, OPNAV. V/MURCIA was last briefed on the status of this investigation on 13Sep16. V/KURTA was last briefed on the status of this investigation on 20Sep16. This investigation remains pending the interview of one witness, the interrogation of S/MORRIS and review by RLSO and S/MORRIS' command for administrative and/or judicial action.


NARRATIVE

1. This reactive investigation pertains to suspected violation(s) of Article 120 (Abusive Sexual Contact) of the Uniform Code of Military Justice (UCMJ)

**FOR OFFICIAL USE ONLY**
PAGE  2

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY/S/ CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE

## U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE
### CONTROL:25JUL16-DCWA-0248-BSNA

19SEP16

and Commonwealth of Virginia Criminal Code 19.2-67.4 (Sexual Battery).

2. On 25Jul16, CDR Steven P. OBERT, JAGC USN, Legal Advisor to the Director, Office of the Chief of Naval Operations (OPNAV), advised V/MURCIA and W/KURTA disclosed incidents of possible abusive sexual contact perpetrated by S/NORRIS, the Executive Director to the CNO Executive (NDOE). The disclosures surfaced during the course of a preliminary inquiry by command into allegations of sexual harassment and poor command climate under the leadership of S/NORRIS. Draft copies of the results of interviews with several NDOE command members were provided to NCIS on 25Jul16; Exhibit (1) pertains.

3. On 26Jul16, V/MURCIA was interviewed at the Center for Naval Analyses (CNA), 3003 Washington Boulevard, Arlington, VA, pursuant to an allegation of abusive sexual contact perpetrated against her by an unidentified male US Navy member, presumed to be S/NORRIS, while she worked as a civilian contractor in Conference Services at CNA. V/MURCIA's initial statement was conducted in Spanish after she indicated having limited English language proficiency. A summary of the facts discussed during the interview was translated into English in her presence and at a pace V/MURCIA was able to understand and corroborate as accurate. During her recorded interview, V/MURCIA confirmed that a man employed by the US Navy brushed her right ribcage area and the lower part of her right breast as he was passing her on his way into the building's foyer after a fire drill. V/MURCIA believed this man's intentions were sexual because of the way he looked at her. V/MURCIA indicated the incident happened about two months prior to the interview, and was witnessed by an unknown party that reported it to V/MURCIA's boss, Beth BOROWSKI, CIV. V/MURCIA admitted the man's actions made her very uncomfortable but reiterated on several occasions that she did not intend to report the incident. V/MURCIA said that she did not know the name of the man, but described him as black, slim, and tall. V/MURCIA explained she had seen him before at work and would describe him as "handsy" because he made it a point to touch her shoulders or arms in passing every time he greeted her. V/MURCIA said that he has since transferred to a Pentagon office with his staff. At the conclusion of the interview, V/MURCIA was provided with Victim and Witness Awareness Pamphlets (VWAPs) in English and Spanish. An audio/video recording of the interview was entered into the NCIS Resident Agency Washington, D.C. evidence custody system under Log Number 154-15. V/MURCIA did not desire a Military Protective Order (MPO). Additionally, as a civilian, V/MURCIA is not entitled to Victim's Legal Counsel (VLC) nor a Victim Advocate (VA) provided by the Department of Defense (DOD); Exhibit (2) pertains.

4. On 26Jul16, the area in the CNA building where V/MURCIA was touched by an unknown US Navy member without her consent was photographically documented utilizing a Sony Cybershot digital camera. The entrance to the CNA building is located along Washington Boulevard and consists of a set of double glass doors leading from the sidewalk into a small, glass enclosed area, and a second set of glass doors which open into the foyer of the building. According to V/MURCIA, she was holding one of the inner glass doors open when she was contacted; Exhibit (3) pertains.

5. A Sexual Assault Forensic Examination (SAFE) was considered in this case for V/MURCIA but was not done due to the nature of the offense, and the

FOR OFFICIAL USE ONLY
PAGE  3

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE. CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTY REQUIRE ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(IES) CONCERNED WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE
## CONTROL:25JUL16-DCWA-0248-8SNA

19SEP16

length of time elapsed between the incident and reporting of same to law enforcement: Exhibit (4) pertains.

6. On 26Jul16, Susan ADAMS, CIV, was interviewed pertaining to her knowledge of V/MURCIA's allegation of abusive sexual contact. ADAMS, who is V/MURCIA's supervisor, stated V/MURCIA was normally reliable, punctual and cheerful, but several weeks ago, she was late and seemed upset. V/MURCIA discussed several stressors but did not disclose any incidents of abusive sexual contact to ADAMS. Exhibit (5) pertains.

7. On 26Jul16, Beth BOROWSKI, CIV, Director, Real Estate and Facility Management, CNA Corporation, 3003 Washington Boulevard, Arlington, VA provided the specific dates of building false alarms within the past two months, as V/MURCIA alleged an incident of abusive sexual contact occurred while she was holding the door for workers to exit the building during a false alarm approximately two months prior. BOROWSKI relayed false alarms were reported on Tuesday, 03May16 and Saturday, 21May16. Due to the fact V/MURCIA reported the incident occurred during the work week, BOROWSKI opined the date V/MURCIA was referencing in her allegation was 03May16; Exhibit (6) pertains.

8. On 11Aug16, V/KURTA was contacted in attempt to schedule an interview regarding her knowledge of the captioned allegations. V/KURTA was the Executive Assistant to S/NORRIS when the NOOK command was located at the CNA building in Arlington, VA. V/KURTA stated she was very nervous coming forward because she was concerned about retaliation; however, V/KURTA agreed to talk about the abusive sexual contact perpetrated against her by S/NORRIS during the week of 22Aug16; Exhibit (7) pertains.

9. On 12Aug16, a Military Protective Order (MPO) precluding S/NORRIS' contact with V/KURTA was issued and is effective until 12Sep16; Exhibit (8) pertains.

10. On 23Aug16, LCDR Shelby McDonald NIKITIN, USN was interviewed regarding statements she made previously during the pendency of a command investigation involving allegations of sexual harassment and poor command climate under the leadership of S/NORRIS. NIKITIN affirmed she was not an eye witness to the abusive sexual contact of V/KURTA nor V/MURCIA, and was not herself a victim of sexual harassment nor abusive sexual contact perpetrated by S/NORRIS. However, NIKITIN stated V/KURTA disclosed several instances of S/NORRIS' inappropriate conduct in the office, and two instances of possible abusive sexual contact. NIKITIN stated she could not recall the exact date when V/KURTA made her disclosures, but opined at least one of the disclosures occurred circa April 2016. NIKITIN recalled V/KURTA told her she had recently lost some weight and S/NORRIS put his hands inside her pant waistband and commented on her weight loss. On a separate occasion, V/KURTA's belt fell to the floor, and S/NORRIS slid it up her body back into place by "snaking" his hands on her legs, thighs and waist. NIKITIN believed both of these incidents occurred in their former office space at the CNA building located in Arlington, VA. NIKITIN also recalled witnessing an incident during a fire drill at the CNA building when all parties were exiting the building and V/MURCIA was holding the lobby doors open, facilitating their exit. NIKITIN was about seven paces behind S/NORRIS when her attention was drawn to V/MURCIA who threw back her elbow with some

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTIES CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTROL:25JUL16-DCWA-0248-8SNA

19SEP16

torso, touching S/MORRIS' hand away from her torso area. NIKITIN stated she did not see where S/MORRIS' hand was in proximity to V/KURCIA's body, only V/KURCIA's reaction to it. NIKITIN stated she had a favorable impression of V/KURTA as an office manager and that she had no reason to doubt her credibility; Exhibit (9) pertains.

11. On 24Aug16, LCDR Christopher James MULLEN, USN was interviewed regarding statements he made previously during the pendency of a command investigation involving allegations of sexual Harassment and poor command climate under the leadership of S/MORRIS. MULLEN affirmed he never directly witnessed any incidents of abusive sexual contact perpetrated by S/MORRIS; however, V/KURTA disclosed to him that she and some other CNA staff members felt uncomfortable around S/MORRIS. V/KURTA did not provided any specific names, nor any specific examples, and MULLEN encouraged her to report any incidents of misconduct through her supervisory chain of command. MULLEN could not recall when V/KURTA made this disclosure to him, but he stated he only worked at the CNA building from October 2015 to April 2016. MULLEN sensed a little bit of tension on V/KURTA's part when she made this disclosure to him. MULLEN confirmed that the CNA staff are civilians or government contractors, and that his unit was the only active duty command in the building. MULLEN did not know any of the CNA staff by name, but stated V/KURTA knew them, and they would occasionally visit with her in her office space. MULLEN stated V/KURTA is a professional, hard working office manager and he had no reason to doubt V/KURTA's credibility. MULLEN characterized S/MORRIS has making some questionable decisions and comments during his command, but he never witnessed S/MORRIS behave in a sexually inappropriate manner with anyone. Exhibit (10) pertains.

12. On 24Aug16, V/KURTA was interviewed pursuant to allegations of sexual harassment and abusive sexual contact that were developed during a command preliminary inquiry into poor command climate and allegations of sexual harassment. Also present during the interview was V/KURTA's husband, RADM Anthony M. KURTA, USN (RET). An audio/video recording of the interview was entered into the NCIS Resident Agency Washington, D.C. evidence custody system under Log Number 293-16. At the conclusion of the interview, V/KURTA was provided with a Victim Witness Assistance Pamphlet (VWAP). V/KURTA disclosed that she was the Executive Assistant to S/MORRIS, who was the Executive Director to the CNO Executive. V/KURTA alleged S/MORRIS perpetrated several acts of sexual harassment and abusive sexual contact against her during her approximately year-long employment as his Executive Assistant, circa 2015-2016, at the CNA building in Arlington, VA. V/KURTA's office was located across from S/MORRIS' office. V/KURTA reported S/MORRIS often touched her shoulder, back, and lower back, or playfully hit her leg when talking with her. Initially, V/KURTA dismissed these incidental touches as part of S/MORRIS' personality as a person who often touches people when he speaks to them. However, these acts progressed into S/MORRIS asking her for hugs, and repeatedly asking her to write things on his white board in front of his desk, so that her back was turned toward him. V/KURTA alleged S/MORRIS would often lean over her chair to read her computer screen, and in doing so, almost rested his head on her head. V/KURTA stated S/MORRIS would often help himself to her lunch to the point where V/KURTA would bring in foods she knew he disliked. V/KURTA stated the aforementioned occurrences of sexual harassment culminated in an incident in early 2016 wherein S/MORRIS put his hands inside the waistline of her pants commenting on her weight

FOR OFFICIAL USE ONLY
PAGE 5

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE. CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY/S CONCERNED WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE
## CONTROL:25JUL16-DCWA-0248-8SNA                          19SEP16

..... when S/MORRIS ran his hands back and forth inside her waistband and tugged on her pants. V/KURTA's adjustable belt fell to the floor. S/MORRIS bent over and slid the belt back up V/KURTA's body, touching her legs and thighs; he then put the belt back in place at her waist, touching the bare skin of her stomach with his hand in the process. V/KURTA stated she wore the same clothes to the interview that she was wearing on the day of the incident, and she demonstrated S/MORRIS' actions on the recording utilizing her husband as a stand-in for herself. The following day, V/KURTA told S/MORRIS his actions had to stop, and that it was not okay for him to behave in the manner he had been behaving. V/KURTA stated S/MORRIS then told her words to the effect of, "Nobody gets to say no but him." V/KURTA also stated she would often speak in Spanish with V/MURCIA, and brought gently used clothing into the office for her on one occasion. When V/KURTA informed V/MURCIA she had some clothes for her in V/KURTA's office, V/MURCIA was reluctant to come to V/KURTA's office to pick them up. When V/MURCIA finally did, V/MURCIA appeared frightened and stated she was scared to walk past S/MORRIS' office because he "undressed her" with his eyes. V/MURCIA requested to leave V/KURTA's office via an alternate route just to avoid walking past S/MORRIS' office; Exhibit (11) pertains.

11. A Sexual Assault Forensic Examination (SAFE) was considered in this case for V/KURTA but was not done due to the nature of the offense, and the length of time elapsed between the incident and reporting of same to law enforcement; Exhibit (12) pertains.

14. On 30Aug16, Reporting Agent (RA) received the results of database inquiries for V/KURTA. On 06Dec07, V/KURTA reported she believed she was being followed on two occasions by the same man when driving from the Naval Support Activity Naples, Italy to her residence in Cuma, Italy. Investigative activity met with negative results, and no further suspicious activity was reported. The case was closed on 15Apr06. On 21Aug94, V/KURTA reported being sexually assaulted by Won Du JO, QM ROKN, (S/JO) aboard Commander Fleet Activities, Chinhae, Republic of Korea (ROK). V/KURTA reported S/JO, who had apparently been drinking alcohol, grabbed her breast and vaginal area while she was at work selling telephone cards at the Morale, Welfare and Recreation (MWR) office aboard base; V/KURTA struggled with the subject briefly, and he left the area. S/JO was apprehended by the ROK Navy Criminal Investigations Division (CID) and admitted to assaulting V/KURTA. However, V/KURTA declined to prosecute, and the investigation was closed on 13Sep94. On 01Nov94, V/KURTA reported receiving a telephonic death threat and a threatening letter while working at MWR; no subjects could be identified, and the case was closed on 28Mar95; Exhibit (13) pertains.

15. On 08Sep16, CAPT John SPRINGETT, USN, Assistant Professor, Defense Strategy, Acquisition and Resourcing, The Eisenhower School, National Defense University, Fort McNair, Washington, DC was interviewed regarding his knowledge of the captioned allegations of abusive sexual contact reportedly perpetrated by S/MORRIS against V/KURTA and V/MURCIA. SPRINGETT stated that he was the Executive Director of the CNO Executive Panel from January 2014 to approximately March 2015. Upon assuming his command, he was provided with a brown folder which contained the results of a command climate survey which went very badly, something which SPRINGETT did not expect for the CNO office. He was given instructions to correct the deficiencies. He described the command as dysfunctional when he took over,

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE. CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTROL:25JUL16-DCWA-0248-8SNA                         19SEP16

and V/KURTA was taken advantage of by his predecessor. SPRINGETT stated
V/KURTA was partially responsible for initiating the command climate survey,
and as a result was re-victimized during the fallout from the survey. When
SPRINGETT got the office back on its feet, V/KURTA trusted him and he became
her confidence. After SPRINGETT left the command for his current position at
the National Defense University, he maintained a professional relationship
with V/KURTA, speaking with her telephonically approximately five or six
times over the course of the next 18 months. SPRINGETT stated V/KURTA's
initial phonecalls discussed the poor command climate and a lack of
discipline under S/MORRIS' leadership, then she progressed to talking to
SPRINGETT about S/MORRIS' strange behavior, to include the wide variety of
girlfriends calling him at the office, asking her food that she brought
herself for lunch, and asking her to do strange things at the office with
respect to booking hotel rooms (vice BOQs for travel). SPRINGETT encouraged
V/KURTA to report S/MORRIS' "dominance" behavior; however, SPRINGETT stated
V/KURTA seemed reluctant to do so based on her prior experience of reporting
poor command climate and the resultant re-victimization she experienced.
Later, V/KURTA reported S/MORRIS' "creepy" behavior to SPRINGETT, but did
not get into specifics. She also related that the cleaning lady, whose name
SPRINGETT did not recall, had concerns about S/MORRIS' behavior. Again,
V/KURTA was encouraged by SPRINGETT to report S/MORRIS' behavior. SPRINGETT
recalled one of the last phonecalls occurred over a weekend during the
summer of 2016 while he was driving back from Luray, VA. V/KURTA was in a
highly emotional state and related she was touched by S/MORRIS. V/KURTA did
not tell SPRINGETT where she was touched or in what manner. SPRINGETT
described V/KURTA as highly credible and absolutely trustworthy; he added
that V/KURTA is "the center of the universe" for that office. SPRINGETT
reported he has known S/MORRIS in a professional capacity dating back to
their first deployment as junior officers; however, he and S/MORRIS have
never had a social relationship. SPRINGETT and S/MORRIS crossed paths
several times over their respective careers. As SPRINGETT was preparing to
leave his position as the Executive Director, he heard S/MORRIS was in the
running for that same position. However, SPRINGETT stated the Executive
Director position was not S/MORRIS' first choice because it was more of a
lateral move, as opposed to a stepping stone for a flag officer position.
Other than on two brief occasions since S/MORRIS assumed the position of
Executive Director for the CNO Executive panel, SPRINGETT had no further
information regarding S/MORRIS' current or recent activities. Exhibit (14)
pertains.

16. On 25Aug16, a digital photographic line-up with an image of S/MORRIS was
prepared by the NCIS Technical Services Detachment Northwest. Exhibit (15)
pertains.

17. On 12Sep16, V/MURCIA participated in a photographic line-up as V/MURCIA
did not know the name of the individual who perpetrated abusive sexual
contact against her. The line-up was conducted in Spanish, which is
V/MURCIA's native language. V/MURCIA identified the image of S/MORRIS as the
offender. The entire photographic line-up, to include V/MURCIA's initialed
and dated identification of S/MORRIS, was entered into the NCIS resident
Agency Washington DC Field Office under Log Number 305-16. Exhibit (16)
pertains.

18. On 13Sep16, the office spaces formerly occupied by S/MORRIS and V/KURTA

**FOR OFFICIAL USE ONLY**
PAGE

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTIES CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.

U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTROL: 25JUL16-DCWA-0248-8SNA                                    19SEP16

at the CNA building where the alleged abusive sexual contact occurred was
photographically documented. Authorization to access the office space, which
was vacant at the time of documentation, was granted by LT Kaitlin SMITH,
DNS-8, Director, Navy Staff, Pentagon, 4C641; physical access to the space
was made possible by Beth BOROWSKI, CIV, Director, Real Estate & Facility
Management, CNA; Exhibit (17) pertains.

19. The Official Military Personnel File (OMPF) of S/MORRIS was obtained and
reviewed for information relevant to the captioned allegations of abusive
sexual contact. No disciplinary nor derogatory information was noted in
S/MORRIS' OMPF; Exhibit (18) pertains.

20. This investigation has been briefed to, and coordinated with, LT
Nicholas INNS, JAGC USN, NDW Region Legal Services Office (RLSO), Angela
LAKEY, Sexual Assault Response Coordinator (SARC) and CDR Steven OBERT, JAGC
USN, Legal Advisor to the Director, OPNAV. On 26Jul16, Detective Robert
SCOLARI, Arlington County, VA Police Department (ACoPD) was advised of
MURCIA's allegations and offered investigative assistance to NCIS as needed.
V/MURCIA was last briefed on the status of this investigation on 19Sep16.
V/KURTA was last briefed on the status of this investigation on 20Sep16.
This investigation remains pending the interview of one witness, the
interrogation of S/MORRIS and review by RLSO and S/MORRIS' command for
administrative and/or judicial action.

PARTICIPANTS
ADLIN VELEZ, SPECIAL AGENT, RESIDENT AGENCY WASHINGTON DC

DISTRIBUTION
NCISHQ:21B2
INFO  :DCFO/NDW RLSO (LCDR Ben ROBERTSON, JAGC USN) (N)/
        Command (CDR Steve OBERT, JAGC USN) (N)/DCWA

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE

8

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

INVESTIGATIVE ACTION                                                      15JUL16

CONTROL: 24JUL16-DCWA-0248-8SNA

SUBJECT: TESS SCOTT/CAPT NBF
R.E/D/W: SSN 492199/07MAY55/FORT LAUDERDALE, FL

RECEIPT OF DRAFT REPORTS OF PRELIMINARY COMMAND INQUIRY

1. On 26Jul16, CAPT Sharon PUEST, USN, Head, Joint and RS 1 Manpower
Requirements Branch, NBF Arlington, VA, provided Reporting Agent (RA) with
draft copies of her results of interviews with several NOOK command members
pursuant to the command directed preliminary inquiry into allegations of
poor climate and sexual harassment.

2. On 06Jul16, CDR Curt LARSON, USN stated he was not aware of any sexual
harassment occurring in the office of NOOK, nor did he witness any acts of
abusive sexual contact perpetrated by S/MORRIS; Enclosure (A)
pertains.

3. On 06Jul16, LCDR James RAYMOND, USN stated V/KURTA related S/MORRIS
commented on her clothing and cut her off in conversation, but opined the
situation was one of command climate not sexual harassment; Enclosure (B)
pertains.

4. On 12Jul16, CDR Mark ZWOLSKI, USN stated he had no concerns regarding
sexual harassment within the command and stated he had nothing negative to
say about S/MORRIS; Enclosure (C) pertains.

5. On 11Jul16 and 15Jul16, Dr. Karen LEED stated V/KURTA disclosed to her
that women in the Center for Naval Analyses disclosed to V/KURTA they had
been "inappropriately" touched (NFI), and that she had not reported these
events earlier because S/MORRIS made it clear that he "knew people." LEED
opined V/KURTA was "scared shitless," though V/KURTA did not disclose to
LEED at that time anything specific about what happened to her. On 15Jul16,
LEED stated V/KURTA related S/MORRIS touched her midsection; Enclosure (D)
pertains

ENCLOSURE(S)
(A) Interview of CDR Curt LARSON, USN/06Jul16
(B) Interview of LCDR James RAYMOND, USN/06Jul16
(C) Interview of CDR Mark ZWOLSKI, USN/12Jul16
(D) Interview of Dr. Karen LEED/11Jul16

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE ... NAVAL CRIMINAL INVESTIGATIVE SERVICE

9

EXHIBIT ( 1 )

## U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTROL:25JUL16-DCWA-0248-8SNA                    28JUL16

REPORTED BY: RACHED WIDGER/WARAM  Special Agent
OFFICE:      RESIDENT AGENCY WASHINGTON DC

FOR OFFICIAL USE ONLY
PAGE  2 LAST   JB V2 DAN

WARNING:
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.

DATE: 6JUL16/1430

SUBJ: Interview with CDR Curt Larson

CDR Larson was not aware of any sexual harassment occurring in the office of NOOK or by Captain Morris. His general observation is that people are careful of how things can be perceived. He saw nothing physical, no touching. If people said something they would catch themselves (he couldn't provide anything specific), he didn't think anything could have occurred that could be interpreted as inappropriate by anyone.

The conversation in the office was good-natured, and if something started to get out of hand or going the wrong way, someone would stop it. He thoguth everyone got along fine and got the work done. Thought it was a normal environment, professional. Friendly but professional with no screaming or scolding.

He never saw Captain Morris put a hand on a shoulder. He said the jokes were all good natured (again, no specifics).

No one brought any concerns forward and he felt the environment would allow for people to bring concerns forward.

He mentioned there were 2 females in the office, Mrs. Kurta and LCDR Nikitin. LCDR Nikitin was a geo-bachelor and he thought she has some personal issues, but it was hard to get anything from her/things in the open.

CDR Larson did discuss that the dynamic in the office was changing. One junior officer was pulled out to work in another office. There was staff churn based on billet realignment.

I asked if knew about any command climate issues and about the command climate survey. He was unaware of any issues and had heard nothing from the command survey. I asked if he thoguth the staff would be comfortable putting anything down, he said he had no idea if the staff would be comfortable because he's not a mind reader. But, he thought if the "boss was inappropriate" the staff would feel comfortable since they were on the CNO's personal staff and it would probably be brought up. If there was a debrief he was somewhere else.

He didn't know of any issues that needed to be addressed. He was blindsided when he got my email and when I told him what I was looking into. He sat there for a minute, and still said he had no "ah ah" moment when he rememembered anything that could be sexual harassment.

There was staff churn, 3 Executive Directors and a realignment in his almost 2 years (August makes 2 years) in NOOK. Said the staff tried to stay middle of the road ethically when "panel

ENCLOSURE  ( fl  )

members try to buy lunch". They always checked with the "judge" on stuff. He couldn't think of anything wrong in NOOK.

DATE: 6 JUL 16/1350

SUBJ: Interview with LCDR James Raymond

LCDR Raymond was hesitant to talk based on his experience with the previous command climate investigation and the politics associated with NOOK. He mentioned he received a letter for his local file based on the previous investigation.

LCDR Raymond mentioned the poor leadership. However, under CAPT Hulsey (spelling) and CAPT Springett it was great. He stated that both CAPT Morris and CDR Larson weren't interested in the jobs.

There was a definitive break between the O4 and O5s. O4 were held to a different standard. They would hear about it when things weren't done, which wasn't the same for the O5. O5 transferred work to E5 or O4.

Mrs. Kurta received prank phone calls. The O4s were accused. Captain Springett fired LCDR Gray and moved him to N97.

Mrs. Kurta was fairly sensitive. Took LCDR Raymond a long time to figure out how to work with her. She can get excited and emotional. Once he figured out her style it was a good work environment. She did confide that she didn't enjoy working for Captain Morris. She also had said she didn't enjoy working for Captain McClay (spelling). The command climate issue was under Captain McClay. There was also a difficult relationship with CDR Larson.

Mrs. Kurta relayed to LCDR Raymond that Captain Morris had made a comment on her clothing.

LCDR Raymond was a witness to the fact that CDR Larson made Mrs. Kurta hold onto his breath mints even though she had said she didn't want to do this.

LCDR Raymond's office was across the office from both Mrs. Kurta and Captain Morris. He didn't witness all of their interactions. Mrs. Kurta had also relayed that she had trouble keeping all of Captain Morris girlfriends straight on which ones to put through on the phone and which ones not to. He also said that Captain Morris would cut Mrs. Kurta off in conversation.

About 2 months ago Mrs. Kurta called him and said NOOK was changing. She felt harassed with no specifics. He told her that if she felt harassed she needed to put in a complaint.

LCDR Nikilion felt she was held to a different standard and that she was going to be the fall girl. She found another job but was told "no".

LCDR Raymond felt that having NOOK located at CNA was a bad call because of lack of interaction with rest of CNO staff.

His personal opinion is this is not sexual harassment but command climate.

17

ENCLOSURE ( 6 )

DATE: 12JUL16

SUBJ: Interview with CDR Zwolski

When I spoke with CDR Zwolski he was surprised the topic was sexual harassment. He has no concerns. He called Captain Triplett to see who I was.

He never saw inappropriate touching. Believes he is sensitive to this. If he saw something that was sexual harassment he would say something. He does know there is a gray area.

The only things he ever saw related to command climate: Captain Morris yelling for people from his office since they didn't have an intercom system and they would have to dial the full phone number. It was a small office so yell peoples name, but not in a derogatory or demeaning way.

Thought Captain Morris was easy to get along with, he has nothing negative to say about him.

Although the climate wasn't what it could be. There was tension between the Deputy and Captain Morris. The climate was great under Captain Springett, took a little hit under Captain Morris. But, he attributes to what he wanted to change a lot and maybe this caused friction.

He did talk with Maria and she was uncomfortable with a lot of things but she never mentioned sexual harassment. When the SSG went away they knew CNO was making big changes. Maria said NOOK is changing and will be new jobs. He knows she had several talks with CDR Larson about this and she mentioned she had talked with Captain Morris. Seemed to be lots of angst and churn. Seemed to be frustration of unknown, who work for, where, with a lot of changes over the last month. He went on leave for ~9days, returned from leave on Wednesday and had to pack the office and be out by Friday.

He thought he was going to be extended for 6 months with the panel. Was told you're not doing that, start looking for orders.

Maria talked to him about a clearance reinvestigation about 1 year ago when the contractor talked to her inappropriately, with comments about how attractive she is. Mrs. Kurta asked him is this was inappropriate he told her yes. Contractor was from somewhere else. This is the only example of potential sexual harassment that he could think of.

ENCLOSURE ( C )

DATE: 11JUL16/1100

DATE: 15JUL16/

SUBJ: Interview with Dr. Maren Leed

Dr. Leed said she worked with Captain Morris since she arrived in September 2015 and her interactions with him have been fine.

There were discussions about the decision to fold N00K into N00Z- number of people to move over etc. N00Z absorbed 3 people from N00K.

CDR Tothroe, N00Z Deputy, told Dr. Leed that Mrs. Kurta had anxiety over her position and what she would be doing.

Dr. Leed met with Mrs. Kurta and told her yes, she wanted her to come over because she had heard great things. Mrs. Kurta told her that Captain Morris had told all of N00K that N00Z did not want them and that they should run.

Dr. Leed said that once Mrs. Kurta realized that she would be moving, and this meeting was not an interview or justification for her to keep her job, she broke down crying. Mrs. Kurta said that N00K was a difficult environment, there was no communication, they would raise issues and then told to keep quiet.

Mrs. Kurta said that women in CNA had come to her and said they had been inappropriately touched. Dr. Leed told Mrs. Kurta she would have to report this. Dr. Leed's impression was that Mrs. Kurta was definitely afraid. Mrs. Kurta mentioned a previous investigation on command climate and that had been told it would be kept quiet and it wasn't.

Mrs. Kurta asked if she had to go back to N00K that day. She was afraid to go back because she would be grilled about her conversation with Dr. Leed. The only people at N00K that day were Captain Morris and YN2. Dr. Leed took her to CDR Collins and he found work.

Dr. Leed ran into VCNO in the hallway, and since Dr. Leed was clearly upset, VCNO asked her what was wrong so she told him.

When Dr. Leed asked Mrs. Kurta why she hadn't said anything about what was going on, Mrs. Kurta said that Captain Morris had made it clear that he knew people, who his friends are and that he had it "wired".

Mrs. Kurta did not provide any other specifics. Dr. Leed didn't leave the conversation with thoughts of sexual assault. She through it was 95% command climate with the exception of the

ENCLOSURE ( D )

comment about CNA women. But, it was apparent to Dr. Leed that Mrs. Kurta was "scared shitless". Mrs. Kurta did not provide any specific comments on what had happened to her.

Mrs. Kurta did say she was physically afraid of the YN, that he was unstable and possibly physically violent. She was emotionally intimidated by Captain Morris and CDR Larson.

Mrs. Kurta did mention something about the support provided to the Executive panel and lunch. Mrs. Kurta said it wasn't right, but Captain Morris did it anyway. Also mentioned travel issue with Newport and staying off base and then flew someone else up.

This meeting happened on a Friday. Prior to the meeting, CDR Collins, Flag Sec, called Dr. Leed to talk about an O4 in N00K and that he needed to get her out of there. And would Dr. Leed help.

Dr. Leed asked LCDR Mullen, previously in N00K, about what was going on in N00K. He didn't give many details, but something just wasn't adding up to Dr. Leed.

When Dr. Leed set up the meeting with Mrs. Kurta, Mrs. Kurta asked if Dr Leed needed to meet with Captain Morris first. There seemed to be friction without a logical basis.

CDR Tothero was the one negotiating with N00K, and there were questions before talking with Mrs. Kurta.

### 15JUL16

Dr. Leed followed up today, via email, with additional information she just received from Mrs. Kurta, regarding inappropriate touching of Mrs. Kurta's midsection. Please see email dated Friday July 15, 2016 0949

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

INVESTIGATIVE ACTION                                                          03AUG16

CONTROL: 25JUL16-DCWA D248-BSUA

S.NORRIS, TERRY SCOTT/CAPT USN
   M/8/MOO6/T/264892199/07MAY66/FORT LAUDERDALE, FL

RESULTS OF INTERVIEW OF V/MURCIA

1. On 26Jul16, Reporting Agent (RA) and Case Agent (CA) Rachel MCGRANAGHAN interviewed V/MURCIA at the Center for Naval Analyses (CNA) Corporation located at 3001 Washington Blvd in Arlington, VA 22201, pursuant to an allegation of abusive sexual contact perpetrated against her by an unidentified male US Navy member, suspected to be S/MORRIS, working in CNA spaces. The allegations of abusive sexual contact arose during V/MURCIA's interview conducted during the course of a preliminary inquiry into the command climate and sexual harassment. V/MURCIA's initial statement made during that inquiry is appended hereto as Enclosure (A). V/MURCIA's interview was initially conducted in Spanish after she indicated having limited English language proficiency. A summary of the facts discussed during the interview were translated into English in her presence and at a pace V/MURCIA was able to understand and corroborate as accurate.

2. During her recorded interview, V/MURCIA confirmed that a man employed by the USN brushed her right ribcage area and the lower part of her right breast as he was passing her on his way into the building's foyer area after a fire drill was cleared. V/MURCIA added she believed his intentions were sexual because of the way he looked at her. V/MURCIA indicated the incident happened about two months prior to RA's interview, and was witnessed by an unknown party that reported it to V/MURCIA's boss, Beth BOROWSKI, CIV. V/MURCIA admitted the man's actions made her very uncomfortable but reiterated on several occasions that she did not intend to report the incident. V/MURCIA said that she did not know the name of this man.

3. V/MURCIA described this man as black, slim, and tall. V/MURCIA explained she had seen him before at work and would describe him as "handsy" because he made it a point to touch her shoulders or arms in passing every time he greeted her. V/MURCIA said that he has since transferred to a Pentagon office with his staff.

4. CA MCGRANAGHAN and RA presented V/MURCIA with a Victim and Witness Awareness Brochure (VWAP) in English at the conclusion of the interview and subsequently, sent her a Spanish version of the same document via electronic mail.

5. Upon conclusion of the interview, V/MURCIA agreed to show RA the location where the reported assault occurred and led RA to the entrance of the CNA Building. V/MURCIA clarified that employees where returning to the building and as part of her duties, she was acting as a porter for them. She

FOR OFFICIAL USE ONLY
PAGE   2

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.

EXHIBIT ( 2 )

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE
## CONTROL:25JUL16-DCWA-0248-8SNA
03AUG16

indicated she was holding the glass door that led to the foyer and as she
held the door with her left hand, her right side was exposed to the incoming
crowd. Enclosure (B) depicts where and how MURCIA was standing when the
unwanted sexual contact occurred.

6. An evidence copy of the recorded interview was placed into NCIS
Washington DC Field Office Evidence vault under log number 254-16 and a
working copy appended to this report as Enclosure (C).

ENCLOSURE(S)
(A) Preliminary interview of V/MURCIA by command/21Jul16
(B) Photograph of Gladys Stella MURCIA's physical location and
    position when the reported abusive sexual contact
    occurred/26Jul16
(C) Copy of the Recorded Interview of Gladys Stella
    MURCIA/26Jul16

REPORTED BY: ADLIN VELEZ, Special Agent
OFFICE:      RESIDENT AGENCY WASHINGTON DC

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.

DATE: 21JUL16/0900

SUBJ: Interview with Estella Murcia

Translator: YN2 DuarteRuiz

I met with Ms. Murcia at the CNA Headquarters, 3003 Washington Blvd.

Ms. Murcia doesn't know the man's name but that he works in an office behind closed doors. His office is in front of her friend Maria's office. She would run into him when she went to see her friend Maria or when he was in a common area. Ms. Murcia cleans the common areas of CNA.

When I asked if she was touched by the man she pointed to her shoulder, arm, back and then said that's how it started. The man would look at her with desire/lust. She first thought the touches were innocent, but as time went on she got more uncomfortable because of how he looked at her.

It was just touches on her back, shoulder, elbow  until the fire alarm test, about 1-1.5 months ago (she wasn't exactly sure of the date). She was holding the door open for people and he walked by and grabbed the bottom part of her right breast. She did not tell anyone what happened. Maria approached her about it because someone must have seen her look of shock and anger. She did tell Maria it happened.

Ms. Murcia did not tell anyone herself. About a week ago, Beth (Borowski, Director of Real Estate and Facility Management for CNA) brought her in and asked her about it. Ms. Murcia isn't sure how Beth found out.

Ms. Murcia said the man never propositioned her or used language of a sexual nature. He only said hello to her.

ENCLOSURE ( *A* )

## NAVAL CRIMINAL INVESTIGATIVE SERVICE
## PHOTOGRAPH FORM



**1. OFFICE CODE: DCWA**

| 2. TITLE: | 3. CCN: | 4. AGENT'S NAME: |
|---|---|---|
| I/Arlington, VA/Allegation of Abusive Sexual Contact by US Navy Officer at the Center for Naval Analyses | 25JUL16-DCWA-0248-8SNA | NCIS Special Agent Adlin VELEZ |

| 5. SUMMARY/DESCRIPTION: | 6. PHOTOGRAPHER/ DATE PHOTO TAKEN: |
|---|---|
| **Photograph of Gladys Stella MURCIA while describing her physical location and position when the reported abusive sexual contact occurred.** | **Special Agent Adlin Velez, 26Jul16** |

NCIS 5580/91 (Rev 06-2010) PREVIOUS EDITIONS ARE OBSOLETE

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

INVESTIGATIVE ACTION

OFFICE: USAO016-DC:  0084 em

ICRNH:, 123AS 8COGY CAPT USN
SUBJ/NCCAV1/C01E82184/SJW 188/FORT LAUDERDALE FL

RESULTS OF CRIME SCENE DOCUMENTATION PERTAINING TO V/NURCIA'S ALLEGATI

1. On 16Jul16, Reporting Agent (RA) photographically documented the location
where V/MURCIA sustained the abusive sexual contact allegedly perpetrated by
against her by S/MORRIS. The photographic coverage was completed utilizing a
Sony Cybershot digital camera. All six digital photographs were copied to a
DVD-P which is appended hereto at Enclosure (A). Enclosure (B) is a
representative sample of four of the digital photography printed in
templates.

2. The entrance way to the Center for Naval Analyses building, located at
4004 Washington Boulevard, Arlington, VA is located along Washington Blvd
and consists of a set of double glass doors leading from the sidewalk into a
small, glass enclosed area, and a second set of glass doors which open into
the foyer of the building. According to V/MURCIA, she was holding one of the
inner glass doors open when she was contacted by S/MORRIS.

ENCLOSURE

A. DVD-P containing all six digital photographs of the building including
   the building's exterior.
B. Representative sample of four digital photographs of the
   entrance to the building printed in templates (Enclosure).

REPORTED BY: RACHEL NOSRANASHAH, Special Agent
FRINEY:      RESIDENT AGENCY WASHINGTON DC

FOR OFFICIAL USE ONLY
PAGE  1 LAST  DE 01 SAW

EXHIBIT ( 3 )

NAVAL CRIMINAL INVESTIGATIVE SERVICE
PHOTOGRAPH FORM



| DATE/TIME | 26JUL16 |
| AGENCY | NCIS |
| CASE # | 25JUL16 DCWA-0248-8SNA |
| PHOTOGRAPHED BY | R. McGranaghan. |

| 1. OFFICE CODE: | | |
|---|---|---|
| NCIS Resident Agency Washington, DC | | |
| 2. TITLE: VARLINGTON, VA/ALLEGATION OF ABUSIVE SEXUAL CONTACT BY US NAVY OFFICER AT THE CENTER FOR NAVAL ANALYSES | 3. CCN: 25JUL16-DCWA-0248-8SNA | 4. AGENT'S NAME: SA RACHEL MCGRANAGHAN |
| 5. SUMMARY/DESCRIPTION: Overall view of photograph placard | | 6. PHOTOGRAPHER / DATE PHOTO TAKEN: SA R. MCGRANAGHAN/26JUL16 |

NCIS 5580/91 (Rev 06-2010) PREVIOUS EDITIONS ARE OBSOLETE

**PHOTOGRAPH (1 of 4)**                                    **ENCLOSURE ( B )**

22

## NAVAL CRIMINAL INVESTIGATIVE SERVICE
## PHOTOGRAPH FORM



**1. OFFICE CODE:**

### NCIS Resident Agency Washington, DC

| 2. TITLE: | 3. CCN: | 4. AGENT'S NAME: |
|---|---|---|
| //ARLINGTON, VA/ALLEGATION OF ABUSIVE SEXUAL CONTACT BY US NAVY OFFICER AT THE CENTER FOR NAVAL ANALYSES | 25JUL16-DCWA-0248-8SNA | SA RACHEL MCGRANAGHAN |

| 5. SUMMARY/DESCRIPTION: | 6. PHOTOGRAPHER / DATE PHOTO TAKEN: |
|---|---|
| Overall view of doorway to the lobby of the Center for Naval Analyses building located at 3003 Washington Blvd, Arlington, VA 22201 | SA R. MCGRANAGHAN/26JUL16 |

NCIS 5580/91 (Rev 06-2010) PREVIOUS EDITIONS ARE OBSOLETE

**PHOTOGRAPH (2 of 4)**                                    **ENCLOSURE ( B )**

## NAVAL CRIMINAL INVESTIGATIVE SERVICE
## PHOTOGRAPH FORM



| 1. OFFICE CODE: | | |
|---|---|---|
| NCIS Resident Agency Washington, DC | | |

| 2. TITLE: | 3. CCN: | 4. AGENT'S NAME: |
|---|---|---|
| I/ARLINGTON, VA/ALLEGATION OF ABUSIVE SEXUAL CONTACT BY US NAVY OFFICER AT THE CENTER FOR NAVAL ANALYSES | 25JUL16-DCWA-0248-8SNA | SA RACHEL MCGRANAGHAN |

| 5. SUMMARY/DESCRIPTION: | 6. PHOTOGRAPHER / DATE PHOTO TAKEN: |
|---|---|
| Overall view of doorway to the lobby of the Center for Naval Analyses building located at 3003 Washington Blvd, Arlington, VA 22201 | SA R. MCGRANAGHAN/26JUL16 |

NCIS 5580/91 (Rev 06-2010) PREVIOUS EDITIONS ARE OBSOLETE

**PHOTOGRAPH (3 of 4)**           24           **ENCLOSURE ( B )**

## NAVAL CRIMINAL INVESTIGATIVE SERVICE
## PHOTOGRAPH FORM



| | | |
|---|---|---|
| **1. OFFICE CODE:** | | |
| **NCIS Resident Agency Washington, DC** | | |

| **2. TITLE:** | **3. CCN:** | **4. AGENT'S NAME:** |
|---|---|---|
| I/ARLINGTON, VA/ALLEGATION OF ABUSIVE SEXUAL CONTACT BY US NAVY OFFICER AT THE CENTER FOR NAVAL ANALYSES | 25JUL16-DCWA-0248-8SNA | SA RACHEL MCGRANAGHAN |

| **5. SUMMARY/DESCRIPTION:** | **6. PHOTOGRAPHER / DATE PHOTO TAKEN:** |
|---|---|
| Overall view of doorway to the lobby of the Center for Naval Analyses building located at 3003 Washington Blvd, Arlington, VA 22201; photograph taken from inside lobby facing Washington Blvd | SA R. MCGRANAGHAN/26JUL16 |

NCIS 5580/91 (Rev 06-2010) PREVIOUS EDITIONS ARE OBSOLETE

**PHOTOGRAPH (4 of 4)**

**ENCLOSURE ( B )**

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

INVESTIGATIVE ACTION                                              /6SEP16

CONTROL: 25JUL16/DCNA-0349 6SNA

(MORRIS, TERRY SCOTT/CAPT/USN
   FILE/MCO6/T/254593193/07MAR66/FORT  LAUDERDALE, FL)

CONSIDERATION OF SEXUAL ASSAULT FORENSIC EXAMINATION  SAFE  FOR V/MURCIA

1  A Sexual Assault Forensic Examination  SAFE  was considered in this case
for V/MURCIA but was not done due to the nature of the offense, and the
length of time elapsed between the incident and reporting of same to law
enforcement precluding the likelihood of recovering forensic evidence.

REPORTED BY: RACHEL MCGRANAGHAN, Special Agent
  (FRICE:        RESIDENT AGENCY WASHINGTON DC

FOR OFFICIAL USE ONLY
PAGE - 1 LAST   J3 V3 LNK

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SER...

26

EXHIBIT ( 4 )

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

INVESTIGATIVE ACTION

ITROS  26JUL15-DCWA-0248-SNTA

HODRIS  TEREZ SCOTT/CAPT USN
//E/HB06/7/36A393153/07NAV15/FORT LAUDERDALE, FC

RESULTS OF INTERVIEW WITH SUSAN NAVEL, CIV

1. On 26Jul15, Reporting Agent (RA) interviewed Susan ADAMS, CIV, Supervisor for Conference Services, (DOB: 24Nov55; Tel: 703-814-7831) regarding her knowledge of the recently changed demeanor of V/MURCIA. For background, ADAMS was identified by Beth BOROWSKI, Director, Real Estate and Facility Management, CNA Corporation, as someone who commented to BOROWSKI that V/MURCIA recently seemed upset at work.

2. ADAMS stated V/MURCIA has worked for her in Conference Services assisting with the catering and cleaning functions. According to ADAMS, V/MURCIA is a reliable worker who is on time for work and cheerful. However, several weeks ago, V/MURCIA appeared to be upset and was late for work. ADAMS stated she asked V/MURCIA what was going on to cause her to be upset and late for work, and V/MURCIA talked about some stressors related to her son traveling and her grandchildren. V/MURCIA did not disclose any incidents of abusive sexual contact to ADAMS. ADAMS acknowledged that there is a slight communication barrier with V/MURCIA owing to the fact that English is V/MURCIA's second language; however, ADAMS stated she has worked with V/MURCIA long enough to learn to communicate fairly well with her. ADAMS stated V/MURCIA's demeanor has improved lately, and she seems to have returned to her cheerful disposition.

REPORTED BY: RACHEL MCGRANAGHAN, Special Agent
OFFICE:      RESIDENT AGENCY WASHINGTON DC

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE. CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE

27

EXHIBIT ( 5 )

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

INVESTIGATIVE ACTION                                                24JUL16

CONTROL: 25JUL16-DCWA-0248-8SNA

S/MORRIS, TERRY SCOTT/CAPT USN
  M/B/NOO8/T/26#B92199/07MAY65/FORT LAUDERDALE, FL

RECEIPT OF FALSE ALARM DATES FROM BETH BOROWSKI, CIV

1. On 25Jul16, Reporting Agent (RA) inquired with Beth BOROWSKI, CIV,
Director, Real Estate and Facility Management, CNA Corporation, 3003
Washington Boulevard, Arlington, VA regarding the specific dates of any
building false alarms within the past two months. For background, V/MURCIA
alleged an incident of abusive sexual contact occurred while she was holding
the door for workers to exit the building during a false alarm approximately
two months prior.

2. BOROWSKI inquired with Marcus NORRISON, CIV, Senior Property Manager,
Transwestern, 3003 Washington Boulevard, Arlington, VA who stated false
alarms were reported on Tuesday, 03May16 and Saturday, 21May16.

3. Due to the fact V/MURCIA reported the incident occurred during the work
week, BOROWSKI opined the date V/MURCIA was referencing in her allegation
was 03May16.

REPORTED BY: RACHEL MCGRANAGHAN, Special Agent
OFFICE:      RESIDENT AGENCY WASHINGTON DC

FOR OFFICIAL USE ONLY
PAGE   1 LAST   JB V2 LRN

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.

EXHIBIT ( 6 )

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

INVESTIGATIVE ACTION

CONTROL: 25JUL16-DEMA-0216-8SN*

9/MORRIS, TERRY SCOTT/CAPT/USN
  11/E/M004/T/264833193/07MAY55/FORT LAUDERDALE, FL

RESULTS OF CONTACT WITH MARIA KURTA, CIV

1. On 11Aug16, Reporting Agent (RA) contacted Maria KURTA, CIV via email to
schedule an interview with her regarding the captioned allegations of
abusive sexual contact perpetrated by CAPT Terry S. MORRIS, USN.

2. KURTA telephoned RA in response to RA's email and stated she was very
nervous coming forward because she is concerned about retaliation. KURTA
explained that CAPT MORRIS knows many people, and she is afraid that if she
interviewed for another position for example, he might intervene so she
would not get the job. However, KURTA agreed to talk about her experience
wherein she was inappropriately touched by MORRIS. KURTA added that he never
touched her breasts or buttocks but did touch her in a sexually
inappropriate manner nonetheless. RA discussed with KURTA the option of a
Military Protective Order (MPO), and KURTA stated she would like RA to make
that recommendation to command.  At the conclusion of the telephone call,
KURTA stated she was going to check her calendar and schedule an interview
with RA for the week of 22Aug16.

REPORTED BY: RACHEL MCGRANAGHAN, Special Agent
OFFICE:      RESIDENT AGENCY WASHINGTON DC

FOR OFFICIAL USE ONLY
PAGE   1 LAST   JB V2 LNN

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.

EXHIBIT ( 7 )

## MILITARY PROTECTIVE ORDER

### PRIVACY ACT STATEMENT

In accordance with the Privacy Act of 1974 (Public Law 93 579), this notice informs you of the purpose of the form and how it will be used. Please read it carefully.

AUTHORITY: 5 U.S.C. 301, Departmental Regulations; 10 U.S.C. 136, Under Secretary of Defense for Personnel and Readiness; and National Defense Authorization Act for Fiscal Year 1995, Sec. 534.

PRINCIPAL PURPOSE(S): To inform the service member and the protected person that the commanding officer is issuing an order to the member prohibiting contact or communication with the protected person or members of the protected person's family or household and directing that the member takes specified actions that support, or are in furtherance of, the prohibition.

ROUTINE USE(S): Any release of information outside of the Department of Defense shall be compatible with the purposes for which the information is being collected and shall be in accordance with an established routine use for the record system where the information is maintained.

DISCLOSURE: Voluntary. Failure to disclose/verify information will not delay either the issuance of the order or the enforceability of the order.

| 1. SERVICE MEMBER | | | | 2. PROTECTED PERSON *(Important - see NOTE)* | | | |
|---|---|---|---|---|---|---|---|
| a. RANK | b. LAST NAME | FIRST NAME | MI | a. RANK | b. LAST NAME | FIRST NAME | MI |
| CAPT | Morris | Terry | S | Ms. | Kuns | Maria | V |
| c. UNIT | | | | c. UNIT | | | |
| Naval District Washington | | | | OPNAV | | | |
| d. INSTALLATION | | | | d. INSTALLATION | | | |
| Washington Navy Yard | | | | Pentagon | | | |

NOTE: Omit information in item 2 that, if known to the service member in item 1, could endanger the protected person.

### 3. INFORMATION SUPPORTING ISSUANCE OF THIS MILITARY PROTECTIVE ORDER

Preliminary inquiry convened on 27 Jun 16.

### 4. THE PROTECTED PERSON HAS ALSO BEEN ISSUED THE FOLLOWING COURT ORDERS:

| a. Civil protection order issued (Date - YYYYMMDD) _____ , in _____ |  | Court |
|---|---|---|
| County, State of _____ | | |

| b. Order issued (Date - YYYYMMDD) _____ , in _____ Court, | | Property Settlement |
|---|---|---|
| County, State of _____ | | Custody and/or Visitation |

DD FORM 2873, JUL 2004    *PREVIOUS EDITION IS OBSOLETE*    Adobe Professional 7.0

EXHIBIT ( 8 )

5. As a Commanding Officer with jurisdiction over the above-named service member, I find that there is sufficient reason to conclude that the issuance of an order is warranted in the best interest of good order and discipline. It is hereby ordered that *(initial applicable portions)*:

a. The above-named service member is restrained from initiating any contact or communication with the above-named protected person either directly or through a third party. For purposes of this order, the term "communication" includes, but is not limited to, communication in person, or through a third party, via face-to-face contact, telephone, or in writing by letter, data fax, or electronic mail. If the protected person initiates any contact with the service member, the service member must immediately notify me regarding the facts and circumstances surrounding such contact.

b. The above-named service member shall remain at all times and places at least ___100___ feet away from the above-named protected person and members of the protected person's family or household including, but not limited to, residences and workplaces. Members of the protected person's family or household include:

c. The above-named service member will vacate the military residence shared by the parties located at:

d. Until further notified, the above-named service member will be provided temporary military quarters at:

e. The above-named service member will attend the following counseling:

f. The above-named service member will surrender his/her government weapons custody card at the time of issuance of this order.

g. The above-named service member will dispose of his/her personal firearm(s) that are located or stored on the installation at the time of issuance of this order.

h. Exceptions to this order will be granted only after an advance request is made to me and approved by me.

i. Other specific provisions of this order:

6. DURATION: The terms of this order shall be effective until ___12 September 2016___, unless sooner rescinded, modified, or extended in writing by me.

ENFORCEABILITY: Violation of this order or an applicable civilian protection order shall constitute a violation of Article 90 of the Uniform Code of Military Justice.

| c. COMMANDING OFFICER'S SIGNATURE | d. DATE (YYYYMMDD) |
|---|---|
| M. Tillt  CDR | 20160812 |

7. I hereby acknowledge receipt of a copy of this order and attest that I understand the terms and conditions it imposes on me.

| a. SERVICE MEMBER'S SIGNATURE | b. DATE (YYYYMMDD) |
|---|---|
| | 20160815 |

DISTRIBUTION: Service member
Service member's local personnel file
Protected person (Custodial parent of protected child)

DD FORM 2873 (BACK), JUL 2004

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

INVESTIGATIVE ACTION                                                            23AUG16

CONTROL: 25JUL16-DCWA-0248-8SNA

S/MORRIS, TERRY SCOTT/CAPT USN
  M/B/NOO6/T/364893199/07MAY65/FORT LAUDERDALE, FL

RESULTS OF INTERVIEW WITH LCDR SHELBY MCDONALD NIKITIN, USN

1. On 23Aug16, at approximately 1200, Reporting Agent (RA) and Participating
Agent (PA) Leonard BLUE interviewed LCDR Shelby McDonald NIKITIN, USN. The
interview was conducted regarding statements she made previously during the
pendency of a command investigation involving allegations of sexual
harassment and poor command climate under the leadership of S/MORRIS.
Enclosure (A) contains the summary of NIKITIN's information previously
provided to command. The NCIS interview was conducted at Starbucks, 1101
South Joyce Street B-33, Arlington, VA 22202.

2. NIKITIN affirmed she was not an eye witness to the abusive sexual contact
of V/KURTA nor V/MURCIA, and was not herself a victim of sexual harassment
nor abusive sexual contact perpetrated by S/MORRIS. However, NIKITIN stated
V/KURTA disclosed several instances of S/MORRIS' inappropriate conduct in
the office, and two instances of possible abusive sexual contact.

3. NIKITIN stated she could not recall the exact date when V/KURTA made her
disclosures, but opined at least one of the disclosures occurred circa April
2016. NIKITIN recalled V/KURTA told her she had recently lost some weight
and S/MORRIS put his hands inside her pant waistband and commented on her
weight loss. On a separate occasion, V/KURTA's belt fell to the floor, and
S/MORRIS slid it up her body back into place by "snaking" his hands on her
legs, thighs and waist. NIKITIN believed both of these incidents occurred in
their former office space at the Center for Naval Analyses (CNA) building
located in Arlington, VA. During the disclosure, V/KURTA appeared visibly
shaken, and her eyes were glassy as if she was holding back tears. NIKITIN
initially told V/KURTA she should be clear with S/MORRIS and tell him to
stop making her feel uncomfortable; if the behavior continued, she should
then report him to the appropriate authorities. NIKITIN admitted that she
initially assumed S/MORRIS' inappropriate behavior was a function of him
only having sons, or that he just did not understand the potential
consequences of his actions. However, NIKITIN changed her mind after
attending a Sexual Assault Prevention and Response (SAPR) briefing with
S/MORRIS, which occurred at an unknown date and  time. NIKITIN stated
S/MORRIS was very dynamic during the training, lead the discussions on
several occasions, and knew all of the correct answers. In short, NIKITIN
stated S/MORRIS was the "poster child" for the SAPR training in that he knew
very clearly what was acceptable behavior; however, he apparently conducted
himself inappropriately anyway.

4. NIKITIN stated she recalled witnessing an incident during a fire drill at

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE

32

EXHIBIT (  9  )

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE
## CONTROL:25JUL16-DCWA-0248-8SNA

23AUG16

the CNA building when all parties were exiting the building and "Stella" was holding the lobby doors open, facilitating their exit. "Stella" is one of the CNA staff employees. NIKITIN was about seven paces behind S/MORRIS when her attention was drawn to "Stella" who threw back her elbow with some force, knocking S/MORRIS' hand away from her torso area. NIKITIN stated she did not see where S/MORRIS' hand was in proximity to Stella's body, only Stella's reaction to it.

5. NIKITIN stated S/MORRIS was a very difficult person to read, but she would not articulate what is was about his personality that was particularly difficult to comprehend. However, she stated he was "shady" as a boss, and definitely mismanaged aspects of his office.

6. NIKITIN relayed that S/MORRIS also acting inappropriately in other ways. For example, he would eat part of V/KURTA'S lunch, without her permission, and would physically pick the food off her plate. Apparently, it got to the point where V/KURTA started bringing food items for lunch that she knew S/MORRIS did not like. Additionally, NIKITIN stated V/KURTA was asked S/MORRIS for his share of money for a command function, and he tossed her his large coin purse. When V/KURTA opened it, she was shocked to find crushed Viagra pills.

7. NIKITIN stated she had a favorable impression of V/KURTA as an office manager and that she had no reason to doubt her credibility.

ENCLOSURE(S)
(A) Summary of command interview with LCDR NIKITIN/25JUN16

REPORTED BY: RACHEL MCGRANAGHAN, Special Agent
OFFICE:       RESIDENT AGENCY WASHINGTON DC

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE

DATE: 29 JUN16/ 1205

DATE: 13JUL16/ 1315

SUBJ: Interview with LCDR Shelby Nikitin

29 JUN16/ 1205

LCDR Nikitin did not witness any instances of sexual harassment. She was not personally sexually harassed or any "hands on" instances.

Mrs. Kurta did come to her to talk and was distraught. Mrs. Kurta relayed that Captain Morris put his hands inside her pants waistband, under her belt and the belt fell. Captain Morris ran his hands up her legs when he was putting the belt back.

As LCDR Nikitin was thinking about the past, she remembered a fire drill. From a distance, she saw Captain Morris near the cleaning lady, Stella, and that it looked like he might have been teasing/ribbing her. She saw nothing that struck her as odd or sexually harassing that needed to be reported.

LCDR Nikitin did feel there was discrimination and inequitable treatment in NOOK by Captain Morris. Specifically, she relayed that she was given an observed fitness report after only being assigned 2 weeks. When she was told she was getting an observed fitness report, she questioned CDR Larson about was she the "fodder". Captain Morris only spent 5 minutes debriefing her. Additionally, when NOOK was being disbanded she questioned her close-out fitness report and who would be signing the next one. She was not provided a satisfactory answer so she took her concerns about the NOOK environment to the Flag Sec, CDR Collins, who she considered a mentor.

LCDR Nikitin discussed the climate was not good and that there were potentially sexism and trust issues.

13JUL16/ 1315

Follow- up phone-call. Asked LCDR Nikition about the SAPR training attended by NOOK. Confirmed there was a conversation between her and Mrs. Kurta regarding CAPT Morris being the "poster child for knowing what to do/not do:; "he knows the line". He had so many talking points during the training.

Asked for follow-up on cleaning lady, Stella, thought she saw Stella elbow CAPT Morris away as coming down for fire drill. Appeared his hand may have hit her upper rib/breast.

She felt undercut because she was a female. Comments made "would never want daughters", she couldn't ever get a read on him so not sure how to take the comment.

There was bad communication in the office. She did not hear conversations in the office, as people would go walking.

She did hear CAPT Morris ask Maria what she made him for lunch. He would eat Mrs. Kurta's lunch without her offering to him. Heard Mrs. Kurta saw that was mine, after CAPT Morris had put his hand in her food already, so of course she wouldn't eat it then.

ENCLOSURE ( )

Felt there was no direction in the office, CAPT Morris kept his cards close to him. He wasn't upfront, there was always an excuse, and staff was left in the dark, panel members didn't know what was going on with changes.

Felt there was tension between CDR Larson and CAPT Morris. In all of 2016 they never had a staff meeting. When CDR Larson was asked about it, "One less window to sit with CAPT Morris". However, after the April fitrep cycle, seemed their relationship changed for the better.

Said she saw CDR Larson "shaking" after he was "undermined" by CAPT Morris.

Seems like there was yelling in the office. Was hostile.

Unfair: O5 was able to take leave when no O5s in the office, but she wasn't allowed to take leave to attend function with her husband (Pensacola) but had to come in because no O4s in office. CDR Larson was allowed to put leave in day before when no O5s in office.

Other than the incident told to her by Mrs. Kurta ("pants incident), and potentially seeing cleaning lady elbow CAPT Morris, she is unaware of sexual harassment. Just poor command.

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

INVESTIGATIVE ACTION                                                    24AUG16

CONTROL: 23JUL16-DCWA-0248-BSNA

S/MORRIS, TERRY SCOTT/CAPT USN
   M/B/DOOB/T/264892199/07MAY65/FORT LAUDERDALE, FL

RESULTS OF INTERVIEW WITH LCDR CHRISTOPHER JAMES MULLEN, USN

1. On 24Aug16, at approximately 0800, Reporting Agent (RA) interviewed LCDR
Christopher James MULLEN, USN at the NCIS Resident Agency Washington, DC
field office located aboard Joint Base Anacostia-Bolling. The interview was
conducted regarding statements he made previously during the pendency of a
command investigation involving allegations of sexual harassment and poor
command climate under the leadership of S/MORRIS. Enclosure (A) contains the
summary of MULLEN's information previously provided to command.

2. MULLEN affirmed he never directly witnessed any incidents of abusive
sexual contact perpetrated by S/MORRIS; however, V/KURTA disclosed to him
that she and some other Center for Naval Analyses (CNA) staff members felt
uncomfortable around S/MORRIS. V/KURTA did not provided any specific names,
nor any specific examples, and MULLEN encouraged her to report any incidents
of misconduct through her supervisory chain of command. MULLEN could not
recall when V/KURTA made this disclosure to him, but he stated he only
worked at the CNA building from October 2015 to April 2016. MULLEN sensed a
little bit of tension on V/KURTA's part when she made this disclosure to
him. MULLEN confirmed that the CNA staff are civilians or government
contractors, and that his unit was the only active duty command in the
building. MULLEN did not know any of the CNA staff by name, but stated
V/KURTA knew them, and they would occasionally visit with her in her office
space.

3. MULLEN stated V/KURTA is a professional, hard working, office manager who
is a perfectionist and pays attention to important key details in all her
endeavors. He added that he had no reason to doubt V/KURTA's credibility.
MULLEN characterized S/MORRIS has making some questionable decisions and
comments during his command, but he never witnessed S/MORRIS behave in a
sexually inappropriate manner with anyone. He stated S/MORRIS would take
V/KURTA's food she brought herself for lunch, and made inappropriate
inquiries into her finances.

ENCLOSURE(S)
   A) Summary of command interview with LCDR MULLEN, USN/29Jun16

FOR OFFICIAL USE ONLY
PAGE    1

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE

EXHIBIT ( 18 )

U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTROL: 25JUL16-DCWA-0248-88NA                    24AUG16

FOR OFFICIAL USE ONLY

DATE: 29 Jun 16/0950

SUBJ: Interview with LCDR Chris Mullen

LCDR Mullen indicated he was never a direct witness to sexual harassment. However, Mrs. Kurta did tell him she was uncomfortable and that some in CNA had brought up that they were uncomfortable with Captain Morris. He relayed to Mrs. Kurta that if you experienced harassment you need to report it. LCDR Mullen is unaware of the details of the CNA issues.

His personnel sense was that Mrs. Kurta felt harassed and he discussed that she should report to appropriate outlets.

Based on this, he kept up his vigilance but did not witness anything that could be construed as sexual harassment.

ENCLOSURE ( A )

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

INVESTIGATIVE ACTION                                                    25AUG16

CONTROL: 25JUL16 DCWA-0246-BSNA

S/MORRIS, TERRY SCOTT/CAPT USN
 M B/N006/T/264692195/07HAYES/FORT LAUDERDALE  FL

RESULTS OF INTERVIEW OF V/KURTA

1. On 24Aug16, at approximately 1300, Reporting Agent (RA) and Participating
Agent (PA) Leonard BLUE interviewed V/KURTA at 5A678, the Pentagon,
Washington, DC pursuant to allegations of sexual harassment and abusive
sexual contact that were developed during a command preliminary inquiry into
poor command climate and allegations of sexual harassment. V/KURTA's prior
statements made during the preliminary inquiry are appended hereto as
Enclosure (A). Also present during the interview was V/KURTA's husband, RADM
Anthony M. KURTA, USN (RET). An audio/video recording of the interview was
entered into the NCIS Resident Agency Washington, DC evidence custody system
under Log Number 283-16. At the conclusion of the interview, V/KURTA was
provided with a Victim Witness Assistance Pamphlet (VWAP), a Military
Protective Order (MPO) precluding S/MORRIS' contact with V/KURTA was issued
prior to the interview and is reported under separate cover.

2. The following is a summary of the interview; the interview in its
entirety is appended hereto as Enclosure (B). V/KURTA disclosed that she was
the Executive Assistant to S/MORRIS, who was the Executive Director to the
CNO Executive. V/KURTA alleged S/MORRIS perpetrated several acts of sexual
harassment and abusive sexual contact against her during her approximately
year-long employment as his Executive Assistant, circa 2015-2016, at the
Center for Naval Analyses building located at 3003 Washington Boulevard, in
Arlington, VA. V/KURTA's office was located across from S/MORRIS' office.
V/KURTA reported S/MORRIS often touched her shoulder, back, and lower back,
or playfully hit her leg when talking with her. Initially, V/KURTA dismissed
these incidental touches as part of S/MORRIS' personality as a person who
often touches people when he speaks to them. However, these acts progressed
into S/MORRIS asking her for hugs, and repeatedly asking her to write things
on his white board in front of his desk, so that her back was turned toward
him. V/KURTA also stated S/MORRIS frequently used her Kleenex, which he
could only reach by reaching over her desk and over her. This became so
disconcerting to V/KURTA that she purchased S/MORRIS the same brand and
style of Kleenex for his own office so he did not have to lean over her and
borrow hers. However, V/KURTA's efforts were in vain, as S/MORRIS continued
to use her Kleenex claiming he preferred hers over the one's she purchased
and placed in his office. V/KURTA alleged S/MORRIS would often lean over her
chair to read her computer screen, and in doing so, almost rested his head
on her head. V/KURTA stated S/MORRIS would often help himself to her lunch
to the point where V/KURTA would bring in foods she knew he disliked.

3. V/KURTA stated the aforementioned occurrences of sexual harassment

**FOR OFFICIAL USE ONLY**

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.

EXHIBIT (  11  )

**U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE**
CONTROL: 25JUL16-DCWA-0248-8SNA                                    25AUG16

culminated in an incident in early 2016 wherein S/MORRIS put his hands on
her in a sexual manner. According to V/KURTA, S/MORRIS put his hands inside
the waistline of her pants commenting on her weight loss. When S/MORRIS ran
his hands back and forth inside her waistband and tugged on her pants,
V/KURTA's adjustable belt fell to the floor. S/MORRIS bent over and slid the
belt back up V/KURTA's body, touching her legs and thighs; he then put the
belt back in place at her waist, touching the bare skin of her stomach with
his hand in the process. V/KURTA stated she wore the same clothes to the
interview that she was wearing on the day of the incident, and she
demonstrated S/MORRIS' actions on the recording utilizing her husband as a
stand-in for herself. The following day, V/KURTA told S/MORRIS his actions
had to stop, and that it was not okay for him to behave in the manner he had
been behaving. V/KURTA stated S/MORRIS then told her words to the effect of,
"Nobody gets to say no but him."

4. V/KURTA stated S/MORRIS knew his behavior was unacceptable, and
demonstrated his profound and thorough knowledge of the subject matter of
sexual harassment in the workplace at a Sexual Assault Prevention and
Response (SAPR) training in early 2016. V/KURTA explained S/MORRIS knew all
of the answers to the scenarios and led many of the discussions.

5. V/KURTA also stated she would often speak in Spanish with V/MURCIA, and
brought gently used clothing into the office for her on one occasion. When
V/KURTA informed V/MURCIA she had some clothes for her in V/KURTA's office,
V/MURCIA was reluctant to come to V/KURTA's office to pick them up. When
V/MURCIA finally did, V/MURCIA appeared frightened and stated she was scared
to walk past S/MORRIS' office because he "undressed her" with his eyes.
V/MURCIA requested to leave V/KURTA's office via an alternate route just to
avoid walking past S/MORRIS' office.

ENCLOSURE(S)
  (A) Summary of notes from command interview of V/KURTA/various
      2016
  (B) DVD-R containing working copy of audio/video recording of
      interview with V/KURTA on 24Aug16

REPORTED BY: RACHEL MCGRANAGHAN, Special Agent
OFFICE:        RESIDENT AGENCY WASHINGTON DC

**FOR OFFICIAL USE ONLY**
PAGE   2 LAST   JE V2 LNN

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE

DATE/TIME: 28 JUN 16/1541

DATE/TIME: 5 JUL 16/ 1408

DATE/TIME: 5 JUL 16/ 1516

DATE/TIME: 6 JUL 16/1317

DATE/TIME: 13 JUL 16/1100

DATE/TIME: 14 JUL 16/1111

DATE/TIME: 21JUL16

SUBJ: Summary of Phone Interview with Maria Kurta


28 JUN16/1541

Initial contact made with Mrs. Kurta. She expressed concern that she is not the one to initiate anything. She is uncomfortable and doesn't want it to be only Mrs. Kurta.

Mrs. Kurta said that Captain Morris previously mentioned that he was good friends with Captain Triplett and that he knows DNS. She would be OK to talk with me after I talked with other staff members who worked at N00K while Captain Morris was Director. She provided the following names:  LCDR Shelby Nikitin, LCDR Chris Mullen, LCDR James Raymond, LCDR Lewis Patterson, CDR Curt Larson, YN2 Brandon Boggan, and CDR Mark Zwolski.


5 JUL 16/1408

This was my second conversation with Mrs. Kurta.

Mrs. Kurta started the conversation off stating she thought there was possible confusion from our first conversation. She stated she was apprehensive about talking.

While talking with her new boss, Dr. Leed, the conversation turned into a different conversation then Mrs. Kurta expected. The conversation turned from just about the job to other things in N00K, and that Mrs. Kurta did not feel things in the office were done in error. However, Mrs. Kurta stated she didn't want to start trouble. But, her husband was contacted by VCNO about what happened in N00K.

She doesn't want things looked at just 1 thing; she said she was embarrassed about the harassment. She wants to talk holistically.

ENCLOSURE ( A  )

Mrs. Kurta recommended I contact Captain John Springett as he warned her about Captain Morris. Mrs. Kurta would call Captain Springett for a sanity check. She also would talk with her husband to get a sanity check.

Mrs. Kurta said that originally she thought Captain Morris touching her on the shoulder, or putting his hand on her back then lower back was his personality or maybe he didn't know what he was doing.

Mrs. Kurta discussed 1 incident that, there was no excuse for. She was on an Atkins diet with her husband and she lost weight. This was about 3 months ago. She said Captain Morris called her over, put his arms on her waist and after her adjustable belt fell to the ground, he bent over and picked it and as he put the belt back he put his hands on her legs, hips and waist, ending with his hands on her skin under her belt. She said "what are you doing". She felt in shock and was humiliated. She went home that night and immediately changed and told her husband that those clothes probably had his (Captain Morris) DNA all over them. The next day Captain Morris came up to her and was making fun of her, She told him this has to stop. Captain Morris kept laughing and she said stop now I find this offensive. He said I am the only person in this office who gets to say "no". She said she told him no you can't. He backed off some, but continued to put his hands on her shoulders or back. He never touched her breast or buttocks.

She relayed occasion when Captain Morris continually came to her office for Kleenex. Because this was happening frequently, she bought him the same type of Kleenex she used for his office. Captain Morris continued to come to her office for Kleenex because he said "I like your Kleenex better".

Mrs. Kurta relayed that couple ladies at CNA approached her. One was the cleaning lady, Stella (who speaks limited English), and she didn't want to walk by Captain Morris office. Mrs. Kurta relayed that she wanted Stella to come to her office to pick up clothes that she was giving her after cleaning out her closets. Stella said that it was the way Captain Morris looked at her and that he had tried to put his hands on her. Another lady came to her and said that Captain Morris had hugged her inappropriately. Mrs. Kurta wasn't sure if they wanted to talk about it.

Mrs. Kurta discussed that the office was dysfunctional. Staff meeting after staff meeting was cancelled. Then Captain Morris wasn't sure he wanted to hold them anymore. There were no staff meetings for 6 months.

Mrs. Kurta also discussed the Deputy, CDR Larson? She stated he would go home for lunch. Then it progressed to going home for lunch/naps, come back for 45 min, then leave for 2 hour workouts. His departure progressed to leaving at 1100/1200 and not come back until 1530/1600 every day. When Mrs. Kurta confronted Captain Morris, he told her not to worry about it; his typical line would be "I'm not listening".

She felt she couldn't move from her desk because people weren't around. The panel members couldn't get in touch with people. People didn't wear uniforms from a few hours to all day. Some panel members that were asked to step away from serving on the panel were told by Captain Morris "it was CNO's advisor, Dr. Maren Leed that drove this".

When she brought up that panel members didn't know who was in charge as there was slacking off. She was told "don't worry" "I'm not listening, I don't want to hear it". She had no idea who was taking care of day to day functions.

Captain Morris told her that his position wasn't a flag making position so he started interviewing for other positions- both civilian and military.

When Captain Morris would get back from leave he would hug her. Would say "Get over here. Give me a hug". She didn't have this type of relationship with him and didn't feel this wasn't something a professional do.

The way it (the office) got, was not right. She thought it wasn't right, but that is was innocent, then she thought he was just a friendly "toucher", but then began to feel it was inappropriate.

Stella (CNA cleaning lady) told Mrs. Kurta: "I'm afraid. I don't want to be around him (Captain Morris). He has put his hand on my waist" Stella had run from Captain Morris. Stella didn't say more than hands on her waist, but she was very afraid.

Mrs. Kurta discussed the disrespect that YN2 was allowed to display. Mentioned an HRO complaint where David Macht from DNS called to talk about YN2's unprofessionalism towards Tara Davis. Mrs. Kurta mentioned that YN2 was up for a med board but still was allowed to have a part-time job as a wrestling coach. LCDR Mullen took the initial complaint, and sent to Mrs. Kurta and CDR Larson. She is unaware if Captain Morris or CDR Larson followed up.

Mrs. Kurta expressed a concern about retaliation. This came up because she talked with Dr. Leed, in what was to be an informal conversation that transitioned to the climate of NODK. Dr. Leed talked with VCNO who called Mrs. Kurta husband since they were classmates.

Mrs. Kurta discussed retaliation because Captain Morris threw out names and that he knew people. Specifically, Mrs. Kurta mentioned that Captain Morris threw out Captain Triplett, VADM Thomas, RDML Holsey, RADM (ret) Sinclair Harris, and RDML (ret) Annie Andrews names. And that he interviewed for jobs, both military and civilian.

She also said CDR Larson had told her, don't call or contact Captain Morris. And that Captain Triplett had told Captain Morris to not contact the staff.

CDR Larson- was gone a lot of the day, he didn't want to bother with the office because he wasn't an Admin job person he was EOD. And that he couldn't be bothered with stuff. He wouldn't stoop low, that he would find something else to do. Mrs. Kurta interpreted things that happened as "You scratch my back, I'll scratch your back".

5 JUL 16/ 1516

Mrs. Kurta called back on 5 JUL, and relayed the following. There were white boards in both her office and Captain Morris office. Captain Morris asked her to write things on the white board, he would dictate to her what he wants her to write on the board. He even rearranged his office. Then, he said no, you write on your white board. Captain Morris then came to her office and spent a lot of time in her office. She would work on emails and he would stand behind her and put his hands on her shoulder. Sometimes, his head would almost be on her shoulder.

Seemed like he would find excuses to be in her office. Then things escalated to the "pants incident".

### 6 JUL16/1317

Mrs. Kurta expressed her concern about where report would go, and if names would be extracted. She did not want to provide a written statement but is willing to review this statement.

### 13JUL16/1100

Follow up phone call based on interview with Captain Morris. Asked if Captain Morris called her short. She said yes, and it started out as a joke at first. She just thought he was unprofessional in the office. But, this went on for several months. He would ask if she was shorter today. This joking was with both CAPT Morris and CDR Larson. She thought this was inappropriate because of the issues with YN2 disrespect- he would laugh. At one point, CDR Larson called her a midget. They would find things to pick on her about. After months of this, Mrs. Kurta told CAPT Morris this couldn't go on, because anytime you joke YN2 thinks he can too and you know the problems, and Mrs. Kurta doesn't like this. CAPT Morris response "ain't happening", he's the CAPT and he gets to say anything he wants. She said he argued back and forth and she firmly told him you can't because this is demeaning to her. He also asked her personal questions, how old are you, etc.

I asked her about our initial interview, and her comment that "things didn't feel right". You mentioned that you told him it was inappropriate after the "pants incident" and that he somewhat backed off. Did you say this was unprofessional or makes me uncomfortable? She never felt comfortable, from almost day one. The first time she met, he looked her up and down, he said let's take a walk. HE asked where she was from, her reply was California. He said no, your ethnicity-- Puerto Rican/Cuban. Then asked if she spoke Spanish. At one time, he sat her down for 5 hours and talked to her. CDR Larson wasn't in the office the day CAPT Morris checked in, and that CDR Larson told her she had it.

According to Mrs. Kurta, Captain Springett warned her about Captain Morris, and that 2-3 guys had to in and tell CAPT Morris that he had to fire someone. Mrs. Kurta would run things by CAPT Springett and her husband for a sanity check.

Mrs. Kurta pointed out that she had good working relationships with prior directors; she had a type of relationship with them after they left where she would hug them if she ran into them- professional. But, she didn't have that relationship with CAPT Morris, it's hard to explain. He wanted to hug her from day

one. The tone of the office made her feel very different and uncomfortable.  Believes CAPT Morris lied to her, the office and panel members.

She made hotel reservations for him. She offered to help with him with a vacation stay. But, he said make sure you tell the hotel I'm a wounded veteran because you would be surprised on the things you get.  She offered to help him with hotel stays for his lady friends, because maybe he wouldn't be so "grabby grabby" with her if these ladies were able to satisfy his needs. He did bring one lady into the office after the "pants incident"; she asked if the lady was his girlfriend, he said they see each other. Mrs. Kurta recommended he make it official.  She thought she would feel relieved if he made it official/had a girlfriend to date to fulfill his needs so he wouldn't be touchy.  Seems like he needed someone.

I asked her if his touches were " of a sexual nature".  For him, the pats on the back were like a "sliding hand", very very slowly shoulder to shoulder blade.  It felt more...wasn't like a grab shoulder (that could feel comfortable), this was a slow moving hand, slithering hand.  Very uncomfortable.

One time, he gave her a change bag for a breakfast, there were lots of $1/5/20.  It was an "Indian stitch bag".  She felt uncomfortable with this huge wad of cash because all she was looking for was the coins to make change.  Looking at the coins in the bag, she saw 6 or 7 blue pills, cut in half, looked like Viagra to her.  She was shocked, LCDR Nikitin asked her what was wrong. She wasn't sure if CAPT Morris knew the pills were in there.

After the "pants incident", she told CAPT Morris, "This has got to stop".  He seemed clueless.  "I find the things you are doing and saying offensive".  His response " I am the only one in this office who gets to say no".  She told him " You can't do this".  "I can do anything I want. Anything".  He was a little more distant, quiet.  Few weeks later he was back to putting his hand on her shoulder/back.  She did not specifically tell him the "pants incident" was wrong.  She meant everything he was doing, anything under the category of things he knew he shouldn't be doing.

The "pants incident"- Mrs. Kurta repeated what she previously stated about this incident.  He hands touched her skin when her belt fell.  He picked it up and his hands were on her legs, hips on the way up from picking up the belt.  She did not leave work that day after this happened, she got home changed, then took the clothes and put them on her table at home. Told her husband they probably had his DNA on them. She called Captain Springett. Her husband wanted to go to CNO, she didn't want the incident to get out.  Told her husband "no", please don't because she likes her job.

She worried about retaliation.  She was already uncomfortable in the work environment, and she was worried about retaliation.  Her PD was supposed to be reworked over a year ago, CDR Larson said no he wouldn't do it because he wasn't an ADMIN person.  Her objectives (she has 4) did not get signed until ~May, when should have been completed in October.  She had to keep pressing to get her mid-term signed off in May (should have been March).  She was worried about getting a bad evaluation or retaliates against her for a promotion because CAPT Morris knows too many people.  He could stop her from getting a different job, if she decided to apply for one, because she didn't want to be "the person

to take CAPT Morris" down. In the past she's always had wonderful evaluations. Oftentimes CAPT Morris would say he was a hard rater, and "you'll know if you aren't doing something right".

She felt that any moves in the office, she had to get approval, even to make calls. He would ask lots of questions about who was calling, what she was saying.

Mrs. Kurta said that CAPT Morris would say manipulative things. Like- Dr. Leed doesn't need you, CDR Larson- "Do you really think N00Z will be good to you?" He laughed and said, "dream on, dream on"


During Mrs. Kurta initial meeting with Dr. Leed, she thought it was an interview. Mrs. Kurta relayed what had been said to her about transitioning to N00Z. So, when the meeting wasn't an interview, Mrs. Kurta told Dr. Leed about the office climate then other things, like the inappropriate touching. Dr. Leed told Mrs. Kurta she had to tell someone. Mrs. Kurta believes her husband may have told VCNO that CAPT Morris was a "sexual predator", but his loyalty was with his wife.

In early 2016, N00K attended SAPR training at PTGN- Nikitin, Mullen, Kurta, Morris. CDR Larson and YN2 were on leave. CAPT Morris sat at the head of the table. She was floored because the facilitator asked questions and CAPT Morris knew all the answers. She was floored because if he knew all the answers then why was he acting this way. LCDR Nikitin comment "These people who are pros" " this is poster child behavior".

Mrs. Kurta mentioned sexual harassment for the first time today. Yes, his behavior is sexual harassment. There were days when she wore a dress, she would go into his office and he would touch her with the back of his hand on her bare leg. Wasn't sure if this was to get her attention.

Other issues:

--DTS—off base lodging in Newport, RI and Newport Beach VA. Several times to see SSG and didn't want to stay on base, CAPT Morris and CDR Larson would tell YN2 to hold off booking until there was no availability on base. Other times, used justification that it was best use of time to stay with panel members since had to drive them to meet with SSG. However, flew extra person up to drive car. When Mrs. Kurta confronted CAPT Morris, response was "I can do anything I want", " I'm going to say I didn't know" or "I'm going to play innocent until I'm caught" . One time all O4s flew up to be drivers.

--local travel vouchers were being used to drop off and pick up dry cleaning at PTGN or go for a haircut. The travel, not the bill for the service. Or, sometimes medical when it was at your convenience. (Indicated this was being done by CDR Zwolski and YN2)

Mrs. Kurta brought this to the attention of the previous deputy, but believes the instances increased under CAPT Morris. Mrs. Kurta was the back-up for DTS, CDR Larson was primary.

Mrs. Kurta wants to make sure everything is taken into account, not just the sexual harassment but everything that was going in the office. Doesn't want it to be just her, feel like this is exposing her but it not just about her but how the office was run and the things that were allowed to be done. Feels like CDR Larson and YN2 have been protected. Believes others would say things that happened. She is very concerned about retaliation/retribution and the impact on her reputation. Repeated again about CAPT Morris "connections", and she doesn't want to be the person to "take him down" as she believes this will hurt her in the future. When I reminded her about the investigation and not talking with others, she said that after one of our conversations LCDR Mullen overheard her. He commented that if Mrs. Kurta would have come to him, he would have done something about it. She did say she told a couple people they may be contacted, but did not discuss why. (Raymond and Springett)

<u>14JUL16/1111</u>

Mrs. Kurta contacted me to tell me she wouldn't provide a written statement. She again repeated her concern that there will be some type of retaliation. That there will be paperwork floating out there that even the YNs can see and this will come back to get her if she interviews for a job with one of Captain Morris' friends. She's happy to talk with me or someone else if she knows it will be confidential. She just knows it will float out there. She will not put anything in writing. She wants to have as little paper trail as possible.

<u>21JUL</u>

Mrs. Kurta contacted me to say that LCDR Patterson was out to see and that he had tried to contact me.

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

INVESTIGATIVE ACTION                                              0663F16

FILE #: 7530016-DTWA-245-8941

I NOPPIS, TSPR; SCOTT/CAPT USN
V E J0 & T 104395194  WNAVES/FORT LAUDERDALE, FL

CONSIDERATION OF SEXUAL ASSAULT FORENSIC EXAMINATION (SAFE) FOR V/MURCIA


1  A Sexual Assault Forensic Examination (SAFE) was considered in this case
for V/MURCIA but was not done due to the nature of the offense, and the
length of time elapsed between the incident and reporting of same to law
enforcement precluding the likelihood of recovering forensic evidence.




REPORTED BY; RACHEL MCGRANAGHAN, Special Agent
OFFICE;    RESIDENT AGENCY WASHINGTON DC




FOR OFFICIAL USE ONLY
PAGE  1 LAST   08 OF UNIT

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE

EXHIBIT ( 12 )

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

INVESTIGATIVE ACTION

CONTROL: 25JUL16-DCWA-0248-8SNA

S/MORRIS, TERRY SCOTT/CAPT USN
  M/B/N009/T/25489Z139/07MAY65/FORT LAUDERDALE, FL

RESULTS OF DATABASE INQUIRIES FOR V/KURTA

1. On 30Aug16, Reporting Agent (RA) received the results of database inquiries for V/KURTA. On 06Dec07, V/KURTA reported she believed she was being followed on two occasions by the same man when driving from the Naval Support Activity Naples, Italy to her residence in Cuma, Italy. Investigative activity met with negative results, and no further suspicious activity was reported. The case was closed on 15Apr08.

2. On 31Aug94, V/KURTA reported being sexually assaulted by Mon Du JO, OH ROKN, (S/JO) aboard Commander Fleet Activities, Chinhae, Republic of Korea (ROK). V/KURTA reported S/JO, who had apparently been drinking alcohol, grabbed her breast and vaginal area while she was at work selling telephone cards at the Morale, Welfare and Recreation (MWR) office aboard base; V/KURTA struggled with the subject briefly, and he left the area. S/JO was apprehended by the ROK Navy Criminal Investigations Division (CID) and admitted to assaulting V/KURTA. However, V/KURTA declined to prosecute, and the investigation was closed on 12Sep94.

3. On 08Nov94, V/KURTA reported receiving a telephonic death threat and a threatening letter while working at MWR; no subjects could be identified, and the case was closed on 28Mar95.

REPORTED BY: RACHEL MCGRANAGHAN, Special Agent
OFFICE        RESIDENT AGENCY WASHINGTON DC

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.

EXHIBIT ( 13 )

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

INVESTIGATIVE ACTION                                              12SEP16

CONTROL: 25JUL16-DCWA-D24B-8SMA

S/MORRIS, TERRY SCOTT/CAPT USN
  M/8/H006/T/254892199/07MAY65/FORT LAUDERDALE, FL

RESULTS OF INTERVIEW WITH CAPT JOHN SPRINGETT, USN

1. On 08Sep16, Reporting Agent (RA) interviewed CAPT John SPRINGETT, USN,
Assistant Professor, Defense Strategy, Acquisition and Resourcing. The
Eisenhower School, National Defense University, Fort McNair, Washington, DC
regarding his knowledge of the captioned allegations of abusive sexual
contact reportedly perpetrated by S/MORRIS against V/KURTA and V/MURCIA. For
background, SPRINGETT was identified through a command inquiry into
allegations of poor command climate and sexual harassment and provided a
memorandum for the record during the course of that inquiry, Enclosure (A)
pertains.

2. SPRINGETT stated that he was the Executive Director of the CNO Executive
Panel from January 2014 to approximately March 2015. Upon assuming his
command, he was provided with a brown folder which contained the results of
a command climate survey which went very badly, something which SPRINGETT
did not expect for the CNO office. He was given instructions to correct the
deficiencies. He described the command as dysfunctional and a "mess" when he
took over, and V/KURTA was taken advantage of by his predecessor. SPRINGETT
stated V/KURTA was partially responsible for initiating the command climate
survey, and as a result was re-victimized during the fallout from the
survey. When SPRINGETT got the office back on its feet, V/KURTA trusted him
and he became her confidante of sorts. After SPRINGETT left the command for
his current position at the National Defense University, he maintained a
professional relationship with V/KURTA, speaking with her telephonically
approximately five or six times over the course of the next 18 months.

3. SPRINGETT stated V/KURTA's initial phonecalls discussed the poor command
climate and a lack of discipline under S/MORRIS' leadership; then she
progressed to talking to SPRINGETT about S/MORRIS' strange behavior, to
include the wide variety of girlfriends calling him at the office, eating
her food that she brought herself for lunch, and asking her to do strange
things at the office with respect to booking hotel rooms vice BOQs for
travel. SPRINGETT encouraged V/KURTA to report S/MORRIS' "dominance"
behavior; however, SPRINGETT stated V/KURTA seemed reluctant to do so based
on her prior experience of reporting poor command climate and the resultant
re-victimization she experienced. Later, V/KURTA reported S/MORRIS' "creepy"
behavior to SPRINGETT, but did not get into specifics. She also related that
the cleaning lady, whose name SPRINGETT did not recall, had concerns about
S/MORRIS' behavior. Again, V/KURTA was encouraged by SPRINGETT to report
S/MORRIS' behavior. SPRINGETT recalled one of the last phonecalls occurred
over a weekend during the summer of 2016 while he was driving back from

**FOR OFFICIAL USE ONLY**
PAGE   1

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE

**EXHIBIT  (  14  )**

## U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTROL:25JUL16-DCWA-0248-8SNA                          12SEP16

Luray, VA. V/KURTA was in a highly emotional state and relayed she was
touched by S/MORRIS. V/KURTA did not tell SPRINGETT where she was touched or
in what manner. SPRINGETT stated this was a very frustrating conversation
from his perspective and he emphasized to V/KURTA that she could wait no
longer to report S/MORRIS' behavior. V/KURTA assured SPRINGETT that her
husband, a retired Admiral, was going to address the issue to the CNO
directly, as such SPRINGETT let the issue drop, a decision which he stated
he will second guess for a while. SPRINGETT described V/KURTA as highly
credible and absolutely trustworthy; he added that V/KURTA is "the center of
the universe" for that office.

4. SPRINGETT reported he has known S/MORRIS in a professional capacity
dating back to their first deployment as junior officers; however, he and
S/MORRIS have never had a social relationship. SPRINGETT and S/MORRIS
crossed career paths once again when SPRINGETT was the Commodore of an Air
Wing (VAQ) in Whidbey Island, WA and S/MORRIS was the Air Wing Commander on
the east coast. SPRINGETT had a non-criminal ethical issue arise with one of
his commanding officers, and as such, initiated a command investigation. The
investigation was referred to S/MORRIS for additional follow-up. According
to SPRINGETT, it seemed apparent S/MORRIS did not want to follow-up on the
investigation, and likely would not have done so if it were not for
SPRINGETT's insistence.

5. SPRINGETT and S/MORRIS crossed paths again when they were both assigned
to commands in Washington, DC. As SPRINGETT was preparing to leave his
position as the Executive Director, he heard S/MORRIS was in the running for
that same position. However, SPRINGETT stated the Executive Director
position was not S/MORRIS' first choice because it was more of a lateral
move, as opposed to a stepping stone for a flag officer position. Other than
on two brief occasions since S/MORRIS assumed the position of Executive
Director for the CNO Executive panel, detailed in Enclosure (A), SPRINGETT
has no further information regarding S/MORRIS' current or recent activities.


ENCLOSURE(S)
(A) Memo for the Record/13Jul16



REPORTED BY: RACHEL MCGRANAGHAN, Special Agent
OFFICE:      RESIDENT AGENCY WASHINGTON DC



FOR OFFICIAL USE ONLY
PAGE  2 LAST  JB V2 LMW

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(IES) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE

MEMO FOR THE RECORD                                    13 July, 2016

On Monday, 11 July I took a phone call from CAPT Sharon Ruest, an officer stationed in the Bureau of Naval Personnel who has been assigned as a Preliminary Investigating Officer.

CAPT Ruest said that I had been referenced by a witness and requested any information that I had about the current command climate in NOOK, an office on the CNO's staff responsible for the administration of the CNO Executive Panel.

- I am currently an Assistant Professor of Defense Strategy, Acquisition and Resourcing at the Eisenhower School, National Defense University.
- I was the Executive Director of the CNO Executive Panel from Jan, 2014 until Mar, 2015. I worked for ADM Jon Greenert (now retired).
    o I turned the job over to CAPT Alvin Holsey.
    o CAPT Holsey held the position for approximately two months and was replaced by CAPT Terry Morris.
- The NOOK office is not physically located in the Pentagon but is in the headquarters of the Center for Naval Analysis, Arlington VA.

After CAPT Holsey and CAPT Morris conducted their turnover, I visited NOOK on two occasions to talk to CAPT Morris about the job.

- During the first meeting I explained the mission as I saw it and what the practical priorities were.
    o Because CAPT Morris would be working for a new CNO, I relayed that any additional information would have to come from ADM Richardson.
- During the second meeting I explained what I thought some of the opportunities could be for NOOK.

After I departed the position I had a number of informal contacts with three military members of the NOOK staff, LCDR Patterson, CDR (S) Raymond and CDR Larson.

- The discussions with LCDR Patterson and CDR(S) Raymond were primarily about their professional development as they were both departing the NOOK staff to take new jobs.
    o Neither officer mentioned anything about sexual harassment in the office, however I gathered that they were unhappy with the new command climate. I did not encourage an in-depth discussion of this topic.
- The conversations with CDR Larson were much more generic. I gathered only that things in the office had changed.

After I departed, I also maintained a professional relationship with the Executive Assistant at NOOK, Mrs Maria Kurta. In the eighteen months since I departed the office, I have probably had five or six phone discussions with Mrs Kurta.

1

ENCLOSURE ( A )

- I would describe the trend of the phone calls as beginning with a general sense of unhappiness. It was clear that the office dynamics had significantly changed due to the staff turnover. This unhappiness gradually changed to an increasingly specific discomfort with CAPT Morris.
- Mrs Kurta did tell me that the command climate was not good and that the new staff was not happy. I figured that some of this turbulence was just due to the fact that the new CNO had not clearly identified mission or tasking for NOOK.
  - ○ Mrs Kurta related that there was a lack of discipline in the office and that there were officers who were spending very little time at work.
- During the last three or four phone calls, Mrs Kurta began identifying troubling issues with the behavior of CAPT Morris. These issues included:
  - ○ Invasion of Mrs Kurta's "personal space" including inappropriate touching of Mrs Kurta.
  - ○ Deliberately eating Mrs Kurta's meals that were placed in the office refrigerator.
  - ○ A female member of the cleaning staff requested Mrs Kurta help her to stay away from CAPT Morris.
  - ○ The fact that a new female officer felt increasingly uncomfortable with his behavior.
  - ○ There was also some discussion of irregularities in TAD travel, potentially including failures by CAPT Morris to adhere to the Joint Travel Regulations.
  - ○ She mentioned that "there was a lot more that she could say" but that she didn't want to tell me.
- On every single occasion that Mrs Kurta relayed these issues I strongly recommended that she report them up the chain of command or to any of the multiple venues available to report sexual harassment.
  - ○ I did not report these issues myself because Mrs Kurta specifically requested that I not divulge information provided in confidence.
  - ○ Mrs Kurta reported that there were other people who were aware and they would probably take action.

//S//
CAPT John Springett, USN

Assistant Professor
Defense Strategy, Acquisition and Resourcing
The Eisenhower School
National Defense University
Fort McNair, Washington, DC

Room 134
(202) 685-4345

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

INVESTIGATIVE ACTION                                          25AUG16

CONTROL: 25JUL16-DCWA-9248-8EJA

S/MORRIS, TERRY SCOTT/CAPT USN
  HJS/N006/T 254893188/07JAN65/FORT LAUDERDALE, FL

RESULTS OF DIGITAL PHOTOGRAPHIC LINEUP SUPPORT


1. On 11AUG16, Reporting Agent (RA) received a request from NCISRA
Washington, DC to compile a digital photographic lineup. RA received a
digital image of Terry S. MORRIS by NCIS email from Special Agent Rachel
MCGRANAGHAN.

2. On 25AUG16, RA re-sized the image of MORRIS and inserted it into a
digital lineup format in position #3. RA accessed a digital image database
and selected images of five additional individuals each having similar
characteristics to the submitted image of MORRIS. RA then utilized computer
software to adjust the database images to resemble the provided image of
MORRIS in color, size, sharpness, contrast and brightness.

3. RA compiled the final lineup in a sequential format and provided it
electronically by NCIS email to Special Agent MCGRANAGHAN (Enclosure (1)
Pertains).


ENCLOSURE(S)
  A: One (1) Digital Photographic Lineup (MORRIS)




REPORTED BY: LUKE H BOBSON, Investigator
OFFICE:      TECHNICAL SERVICES DETACHMENT NORTHWEST




FOR OFFICIAL USE ONLY
PAGE    1 LAST    JR V2 ENH

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE

EXHIBIT ( 15 )

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

INVESTIGATIVE ACTION

CONTROL: 15JUL16 DCWA 0329-3519

SYNOPSIS: TRANS SCOTT/CAPT USN
M R/HCOSYT/3E3842139/07MAY65/FORT LAUDERDALE, FL

RESULTS OF IDENTIFICATION OF S/MORRIS BY V/MURCIA VIA PHOTOGRAPHIC
LINE-UP

1. On 13Sep16, at approximately 0900, Reporting Agent (RA) and Participating
Agent (PA) Adlin VELEZ met with V/MURCIA at her place of employment located
at the Center for Naval Analyses (CNA) building, 3003 Washington Boulevard,
Arlington, VA. The purpose of the meeting was to conduct a photographic
lineup with V/MURCIA as V/MURCIA did not know the name of the individual who
perpetrated abusive sexual contact against her, as reported previously under
separate cover. PA VELEZ conducted the photographic line-up with V/MURCIA
in Spanish, which is V/MURCIA's native language.

2. V/MURCIA was shown each of the photographs labeled "1-6" one at a time;
after reviewing all six photographs individually, without comparing one to
another, V/MURCIA selected "#3" as the individual who touched her without
her consent circa May 2016. As reported under separate cover, the individual
in position #3 is S/MORRIS. V/MURCIA wrote her initials and date on the
photograph denoting it as her selection. The entire photographic line-up, to
include V/MURCIA's initialed and dated identification of S/MORRIS, was
entered into the NCIS resident Agency Washington DC Field Office under Log
Number 305-16. A copy of the line-up is appended hereto as Enclosure (A).

ENCLOSURE(S):
(A) Copy of photographic line-up with V/MURCIA's identification
    of S/MORRIS/13Sep16

REPORTED BY: RACHEL MCDRANAGHAN, Special Agent
OFFICE:      RESIDENT AGENCY WASHINGTON DC

FOR OFFICIAL USE ONLY
PAGE   1 LAST   JB IC UNK

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(IES) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.

EXHIBIT ( 16 )

MORRIS000062



ENCLOSURE ( A )

MORRIS000062

MORRIS000063



MORRIS000063

MORRIS000064





MORRIS000064

MORRIS000065



MORRIS000065

MORRIS000066



MORRIS000066

MORRIS000067



MORRIS000067

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

INVESTIGATIVE ACTION

CNTRL: 25JUL16 DCWA-0249-ESUA

MORRIS, TERRY SCOTT/CAPT USN
412/0006 T 264392159/07NAT65/FORT LAUDERDALE, FL

RESULTS OF CRIME SCENE DOCUMENTATION PERTAINING TO V/KURTA'S ALLEGATION

1. On 13Sep16, Reporting Agent (RA) photographically documented the office
spaces formerly occupied by S/MORRIS and V/KURTA at the Center for Naval
Analyses (CNA) building, 3003 Washington Boulevard, Arlington, VA, where the
alleged abusive sexual contact occurred. Authorization to access the office
space, which was vacant at the time of RA's documentation, was granted by LT
Kaitlin SMITH, ONS &, Director, Navy Staff, Pentagon, #C681; physical
access to the space was made possible by Beth BOPOWSKI, CIV, Director, Real
Estate & Facility Management, CNA.

2. The office space was photographically documented by RA utilizing a Sony
Cybershot digital camera. All sixteen (16) digital photographs taken of the
office spaces, as well as a floor plan of the space are contained on a CD-R
which is appended hereto as Enclosure (A). Enclosure (B) is a representative
selection of eight (8) photographs printed in templates. The floor plan is
reproduced and attached hereto as Enclosure (C). The office space formerly
occupied by NORK staff, to include S/MORRIS and V/KURTA is located in the
lower right corner of the schematic and is outlined in black. On Enclosure
(C), V/KURTA's former office is highlighted in yellow; S/MORRIS' former
office is highlighted in pink.

ENCLOSURE(S)
(A) CD-R containing all digital photographs, photographs in
    templates and floor plan of CNA office space/13Sep16
(B) Representative sample of eight digital photographs in
    templates/13Sep16
(C) Floor plan of office space/13Sep16

REPORTED BY: RACHEL MCGRANAGHAN, Special Agent
OFFICE:        RESIDENT AGENCY WASHINGTON DC

FOR OFFICIAL USE ONLY
PAGE    1 LAST    JE V1 INV

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTIES CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE

EXHIBIT ( 17 )

## NAVAL CRIMINAL INVESTIGATIVE SERVICE
## PHOTOGRAPH FORM



| 1. OFFICE CODE: | | |
|---|---|---|
| **NCIS Resident Agency Washington DC** | | |

| 2. TITLE:<br><br>S/MORRIS, TERRY SCOTT/CAPT USN | 3. CCN:<br><br>25JUL16-DCWA-0245-8SNA | 4. AGENT'S NAME:<br><br>SA RACHEL MCGRANAGHAN |
|---|---|---|
| 5. SUMMARY/DESCRIPTION:<br><br>Overall view of office spaces formerly occupied by S/MORRIS (indicated by yellow arrow) and V/KURTA (indicated by red arrow) in the CNA building located at 3003 Washington Boulevard, Arlington, VA | | 6. PHOTOGRAPHER / DATE PHOTO TAKEN:<br><br>SA R. MCGRANAGHAN/13SEP16 |

NCIS 5580/91 (Rev 06-2010) PREVIOUS EDITIONS ARE OBSOLETE

**PHOTOGRAPH (1 of 8)**                    **ENCLOSURE (6)**

## NAVAL CRIMINAL INVESTIGATIVE SERVICE
## PHOTOGRAPH FORM



| 1. OFFICE CODE: |
|---|
| **NCIS Resident Agency Washington DC** |

| 2. TITLE: | 3. CCN: | 4. AGENT'S NAME: |
|---|---|---|
| S/MORRIS, TERRY SCOTT//CAPT USN | 25JUL16-DCWA-0248-8SNA | SA RACHEL MCGRANAGHAN |

| 5. SUMMARY/DESCRIPTION: | 6. PHOTOGRAPHER / DATE PHOTO TAKEN: |
|---|---|
| Overall view of office space formerly occupied by V/KURTA in the CNA building, 3003 Washington Boulevard, Arlington, VA | SA R. MCGRANAGHAN/13SEP16 |

NCIS 5580/91 (Rev 06-2010) PREVIOUS EDITIONS ARE OBSOLETE

**PHOTOGRAPH (2 of 8)**

**ENCLOSURE ( )**

## NAVAL CRIMINAL INVESTIGATIVE SERVICE
### PHOTOGRAPH FORM



| 1. OFFICE CODE: | | |
|---|---|---|
| | **NCIS Resident Agency Washington DC** | |

| 2. TITLE: | 3. CCN: | 4. AGENT'S NAME: |
|---|---|---|
| S/MORRIS, TERRY SCOTT/CAPT USN | 2SJUL16-DCWA-0240-6SNA | SA RACHEL MCGRANAGHAN |

| 5. SUMMARY/DESCRIPTION: | 6. PHOTOGRAPHER / DATE PHOTO TAKEN: |
|---|---|
| Overall view of office space formerly occupied by S/MORRIS in CNA building located at 3003 Washington Boulevard, Arlington, VA | SA R. MCGRANAGHAN/13SEP16 |

NCIS 5580/91 (Rev 06-2010) PREVIOUS EDITIONS ARE OBSOLETE

**PHOTOGRAPH (3 of 8)**                                   **ENCLOSURE (⑥)**



## NAVAL CRIMINAL INVESTIGATIVE SERVICE
## PHOTOGRAPH FORM



| 1. OFFICE CODE: | | |
|---|---|---|
| | **NCIS Resident Agency Washington DC** | |

| 2. TITLE: | 3. CCN: | 4. AGENT'S NAME: |
|---|---|---|
| S/MORRIS, TERRY SCOTT/CAPT USN | 25JUL16-DCWA-0248-8SNA | SA RACHEL MCGRANAGHAN |

| 5. SUMMARY/DESCRIPTION: | 6. PHOTOGRAPHER / DATE PHOTO TAKEN: |
|---|---|
| Overall view of office space formerly occupied by S/MORRIS in CNA building located at 3003 Washington Boulevard, Arlington, VA | SA R. MCGRANAGHAN/13SEP16 |

NCIS 5580/91 (Rev 06-2010) PREVIOUS EDITIONS ARE OBSOLETE

**PHOTOGRAPH (4 of 8)**

**ENCLOSURE (b)**

### NAVAL CRIMINAL INVESTIGATIVE SERVICE
### PHOTOGRAPH FORM



| 1. OFFICE CODE: | | |
|---|---|---|
| | **NCIS Resident Agency Washington DC** | |

| 2. TITLE: | 3. CCN: | 4. AGENT'S NAME: |
|---|---|---|
| S/MORRIS, TERRY SCOTT/CAPT USN | 25JUL16-DCWA-0248-85NA | SA RACHEL MCGRANAGHAN |

| 5. SUMMARY/DESCRIPTION: | 6. PHOTOGRAPHER / DATE PHOTO TAKEN: |
|---|---|
| Overall view of office space formerly occupied by S/MORRIS in CNA building located at 3003 Washington Boulevard, Arlington, VA | SA R. MCGRANAGHAN/13SEP16 |

NCIS 5580/91 (Rev 08-2010) PREVIOUS EDITIONS ARE OBSOLETE

**PHOTOGRAPH (5 of 8)**                                    **ENCLOSURE (6)**

## NAVAL CRIMINAL INVESTIGATIVE SERVICE
### PHOTOGRAPH FORM



| 1. OFFICE CODE: | | |
|---|---|---|
| NCIS Resident Agency Washington DC | | |

| 2. TITLE: | 3. CCN: | 4. AGENT'S NAME: |
|---|---|---|
| S/MORRIS, TERRY SCOTT/CAPT USN | 25JUL15-DCWA-0248-8SNA | SA RACHEL MCGRANAGHAN |

| 5. SUMMARY/DESCRIPTION: | 6. PHOTOGRAPHER / DATE PHOTO TAKEN: |
|---|---|
| Overall view of offices spaces formerly occupied by V/KURTA (red arrow) and S/MORRIS (yellow arrow) depicting their proximity to one another | SA R. MCGRANAGHAN/13SEP16 |

NCIS 5580/91 (Rev 06-2010) PREVIOUS EDITIONS ARE OBSOLETE

**PHOTOGRAPH (6 of 8)**                    **ENCLOSURE (6)**

## NAVAL CRIMINAL INVESTIGATIVE SERVICE
## PHOTOGRAPH FORM



| 1. OFFICE CODE: | | |
|---|---|---|
| NCIS Resident Agency Washington DC | | |

| 2. TITLE: | 3. CCN: | 4. AGENT'S NAME: |
|---|---|---|
| S/MORRIS, TERRY SCOTT/CAPT USN | 25JUL16-DCWA-0248-BSNA | SA RACHEL MCGRANAGHAN |

| 5. SUMMARY/DESCRIPTION: | 6. PHOTOGRAPHER / DATE PHOTO TAKEN: |
|---|---|
| Overall view of conference room in office space formerly occupied by N00K | SA R. MCGRANAGHAN/13SEP16 |

NCIS 5580/91 (Rev 06-2010) PREVIOUS EDITIONS ARE OBSOLETE

PHOTOGRAPH (7 of 8)                                    ENCLOSURE (6)

## NAVAL CRIMINAL INVESTIGATIVE SERVICE
### PHOTOGRAPH FORM



| 1. OFFICE CODE: | | |
|---|---|---|
| | NCIS Resident Agency Washington DC | |

| 2. TITLE: | 3. CCN: | 4. AGENT'S NAME: |
|---|---|---|
| S/MORRIS, TERRY SCOTT/CAPT USN | 25JUL16-DCWA-0249-8SNA | SA RACHEL MCGRANAGHAN |

| 5. SUMMARY/DESCRIPTION: | 6. PHOTOGRAPHER / DATE PHOTO TAKEN: |
|---|---|
| Overall view of conference room in office space formerly occupied by N00K | SA R. MCGRANAGHAN/13SEP16 |

NCIS 5580/91 (Rev 08-2010) PREVIOUS EDITIONS ARE OBSOLETE

**PHOTOGRAPH (8 of 8)**                                    ENCLOSURE (6)

None (58 rooms)

Clarendon - 02
Color Scheme: None
Printed on Friday, June 03,
2016

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

INVESTIGATIVE ACTION                                                          11AUG16

 NTROL: 25JUL16-DCWA-0248-HHNA

 MORRIS, TERRY SCOTT/CAPT USN
 M/S/NOU6/T/264893195/07MAY65/FORT LAUDERDALE, FL

REVIEW OF THE OFFICIAL MILITARY PERSONNEL FILE (OMPF) OF CAPT TERRY S.
 MORRIS, USN

1. The Official Military Personnel File (OMPF) of CAPT Terry Scott MORRIS,
USN was obtained from the Defense Personnel Records Information Retrieval
System (DPRIS) and reviewed for information relative to the captioned
allegations of abusive sexual contact

2. BIOGRAPHICAL INFORMATION
DOB: Fort Lauderdale, FL
Mother: Celia Mae NORRIS
Father: James Leon VICKERS (deserted family 07May85)
Brother: Michael MORRIS (USAF)
Brother: Tommie MORRIS (USN)
Ex-wife: Andra Smith MORRIS (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)
Son: Terry S. Morris II (DOB: 05Aug94)
Son: Tyler S. Morris (DOB: 21Sep98)

3. MILITARY INFORMATION
April 1997: Navy and Marine Corps Commendation Medal
May 1996: Navy and Marine Corps Commendation Medal
Sep 1999: Air Medal
Sep 2000: Navy and Marine Corps Commendation Medal
May 2002: Navy and Marine Corps Commendation Medal
Dec 2002: Air Medal
Dec 2004: Navy and Marine Corps Commendation Medal
Jun 2014: Legion of Merit

MORRIS received multiple and repeated laudatory remarks for professionalism
and leadership.

4. DISCIPLINARY INFORMATION
No disciplinary nor derogatory information was noted in MORRIS' OMPF.

REPORTED BY: RACHEL MCGRANAGHAN, Special Agent
OFFICE:     RESIDENT AGENCY WASHINGTON DC

**FOR OFFICIAL USE ONLY**
PAGE   1 LAST   JB V2 LMN

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE

72

EXHIBIT ( 18 )

MORRIS000080

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

REPORT OF INVESTIGATION (INTERIM)                                    27SEP16

SEXUAL ASSAULT - ADULT (II)                        CONTROL: 25JUL16-DCWA-0249-8SNA

S/MORRIS, TERRY SCOTT/CAPT USN
    M/B/NOO4/T/254892198/07MAY65/FORT LAUDERDALE, FL
V/MURCIA, GLADYS STELLA/CIV
    F/W/USXX/N/689053640/13NOV60/BOGOTA, COLOMBIA
V/KURTA, MARIA VIDRO/CIV
    F/W/GS11/T/565537710/16JUN67/LOS ANGELES, CA

COMMAND/OPNAV/0001:

MADE AT/DCWA/RESIDENT AGENCY WASHINGTON DC/RACHEL MCGRANAGHAN,
SPECIAL AGENT

REFERENCE(S)
(A) NCIS Resident Agency Washington DC ROI INTERIM (Contains
    Exhibits 1-18)/19SEP16

EXHIBIT(S)
(19) IA: Results of interview of S/MORRIS/26Sep16
(20) IA: Collection of Arrestee DNA for CODIS/22Sep16

EXECUTIVE SUMMARY
1  This reactive investigation pertains to suspected violation(s) of the
Uniform Code of Military Justice (UCMJ) Article 120 (Abusive Sexual Contact)
and Commonwealth of Virginia Criminal Code 18.2-67.4 (Sexual Battery). On
25Jul16, NCIS Resident Agency Washington, D.C. was notified by CDR Steven R.
OBERT, JAGC USN, Legal Advisor to the Director, Office of the Chief of Naval
Operations (OPNAV), that during the course of a command inquiry into poor
command climate and allegations of sexual harassment perpetrated S/MORRIS,
Executive Director to the CNO Executive Panel (N00K), V/MURCIA and V/KURTA
reported S/MORRIS touched them for the purposes of sexual gratification
without their consent. V/MURCIA and V/KURTA participated in interviews which
were audio/video recorded and copies of same were entered into the NCIS
Resident Agency Washington, D.C. evidence custody system. All incidents
occurred at the CNA building located at 3003 Washington Boulevard,
Arlington, VA; however, Arlington County, VA Police Department (ACoPD) ceded
primary investigative jurisdiction to NCIS with an offer of assistance if
needed. V/MURCIA confirmed that a man employed by the US Navy brushed her
right ribcage area and the lower part of her right breast as he was passing
her on his way into the building's foyer after a fire drill. V/MURCIA
believed this man's intentions were sexual because of the way he looked at
her; she subsequently identified S/MORRIS via photographic line-up. She was
provided a Victim Witness Assistance Pamphlet (VWAP) and did not desire a
Military Protective Order (MPO). As a civilian, V/MURCIA is not entitled to
a Victim's Legal Counsel (VLC) nor a Victim Advocate (VA) provided by the
Department of Defense (DoD). Inquiries with Beth BOROWSKI, CIV, Director,
Real Estate and Facility Management, CNA, revealed the CNA building had a

FOR OFFICIAL USE ONLY
PAGE   1

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE

MORRIS000081

## U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE
### CONTROL:25JUL16-DCWA-0248-8SNA

27SEP16

fire alarm activation on 03May16. V/KURTA disclosed S/MORRIS perpetrated
several acts of sexual harassment and abusive sexual contact against her
during her approximately year-long employment as his Executive Assistant,
circa 2015-2016. V/KURTA stated the aforementioned occurrences of sexual
harassment culminated in an incident in early 2016 wherein S/MORRIS put his
hands inside the waistline of her pants commenting on her weight loss. When
S/MORRIS ran his hands back and forth inside her waistband and tugged on her
pants, V/KURTA's adjustable belt fell to the floor. S/MORRIS bent over and
slid the belt back up V/KURTA's body, touching her legs and thighs; he then
put the belt back in place at her waist, touching the bare skin of her
stomach with his hand in the process. A MPO was issued to S/MORRIS
precluding his contact with V/KURTA and V/KURTA was provided a VWAP. V/KURTA
declined the services of VLC and VA. Sexual Assault Forensic Examinations
(SAFEs) were considered in this case for both V/KURTA and V/MURCIA but were
not done due to the nature of the offense and the time elapsed between the
date of the offense and the reporting of same to law enforcement. Database
inquiries were conducted for S/MORRIS, V/KURTA and V/MURCIA. S/MORRIS'
Official Military Personnel File (OMPF) was reviewed, and the locations in
the CNA building where the alleged offenses occurred were documented.
S/MORRIS was interviewed pursuant to advisement of his Military Suspect's
Acknowledgement and Cleansing Waiver of his rights. S/MORRIS elected to
exercise his rights to remain silent and to consult with an attorney.
S/MORRIS' fingerprints, photographs and DNA were collected and submitted to
the FBI via LiveScan and to CODIS respectively. This investigation remains
pending the interview of one witness and review by RLSO and S/MORRIS'
command for administrative and/or judicial action. This Investigation is
being transferred to Supervisory Special Agent (SSA) Joseph BRUMMUND for
reassignment due to case agent's pending transfer to another NCIS office
effective 01Oct16.

NARRATIVE

1. This reactive investigation pertains to suspected violation(s) of Article
120 (Abusive Sexual Contact) of the Uniform Code of Military Justice (UCMJ)
and Commonwealth of Virginia Criminal Code 18.2-67.4 (Sexual Battery).

2. Investigative activity conducted during the pendency of the captioned
investigation is reported via Ref (A). Subsequent to Ref (A), on 22Sep16,
S/MORRIS was interviewed pursuant to advisement of his Military Suspect's
Acknowledgement and Cleansing Waiver of his rights. S/MORRIS elected to
exercise his rights to remain silent and to consult with an attorney. An
audio/video recording of the attempted interview was entered into the NCIS
Resident Agency Washington DC evidence custody system under Log Number
314-16. Following the attempted interview, RA and PA BLUE fingerprinted and
photographed S/MORRIS. S/MORRIS' fingerprints and three mugshot photographs
were transmitted via LiveScan under Transaction Control Number (TCN)
DCWA0000000543. S/MORRIS was released to CAPT Will TRIPLETT, USN, Executive
Assistant, Director, Navy Staff at approximately 0852; Exhibit (19)
pertains.

3. On 22Sep16, S/MORRIS' DNA was collected and submitted to CODIS utilizing
the USACIL DNA Database Collection Kit Number 0053478 pursuant to a probable
cause determination by LCDR ROBERTSON on 21Sep16; Exhibit (20) pertains.

FOR OFFICIAL USE ONLY
PAGE   2

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE

MORRIS000082

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE
## CONTROL: 25JUL16-DCWA-0248-8SNA

27SEP16

4. This investigation has been briefed to, and coordinated with, LCDR Ben ROBERTSON, JAGC USN, Senior Trial Counsel, NDW Region Legal Services Office (RLSO), Angela LAKEY, Sexual Assault Response Coordinator (SARC) and CDR Steven OBERT, JAGC USN, Legal Advisor to the Director, OPNAV, who was last briefed on the status of this investigation on 13Sep16. V/MURCIA was last briefed on the status of this investigation on 13Sep16. V/KURTA was last briefed on the status of this investigation on 20Sep16. This investigation remains pending the interview of one witness and review by RLSO and S/MORRIS' command for administrative and/or judicial action.

5. This investigation is being transferred to Supervisory Special Agent (SSA) Joseph BRUMMUND for reassignment due to case agent's pending transfer to another NCIS office effective 03Oct16.

PARTICIPANTS
LEONARD BLUE, SPECIAL AGENT,  RESIDENT AGENCY WASHINGTON DC

ACTION
0025 :    Transaction Control Number (TCN) DCWA0000000543
          documents the transmission of S/MORRIS' fingerprints and (3)
          facial images via LiveScan.

DISTRIBUTION
NCISHQ:33B2
ACTION:0025
INFO  :DCFO/DCWA/NDW RLSO (LCDR ROBERTSON, JAGC USN) (III)
        COMMAND (CDR Steve OBERT, JAGC USN) (H)

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.

MORRIS000082

MORRIS000083

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

INVESTIGATIVE ACTION                                                    26SEP16

CONTROL: 25JUL16-DCWA-0248-8SNA

S/MORRIS, TERRY SCOTT/CAPT USN
  M/B/NOO6/T/264892199/07MAY65/FORT LAUDERDALE, FL

RESULTS OF INTERVIEW OF S/MORRIS


1. On 22Sep16, at approximately 0815, Reporting Agent (RA) and Participating
Agent (PA) Leonard BLUE attempted to interview S/MORRIS pursuant to
advisement of his Military Suspect's Acknowledgement and Cleansing Waiver of
his rights. At approximately 0818, S/MORRIS elected to exercise his rights
to remain silent and to consult with an attorney; Enclosure (A) pertains. An
audio/video recording of the attempted interview was entered into the NCIS
Resident Agency Washington DC evidence custody system under Log Number
314-16. A working copy of the recording is appended hereto as Enclosure (B).
Prior to the initiation of the captioned NCIS investigation, S/MORRIS was
interviewed during the pendency of a command investigation involving
allegations of sexual harassment and poor command climate under the
leadership of S/MORRIS. The result of the command directed interview with
S/MORRIS by CAPT Sharon RUEST, USN is appended hereto as Enclosure (C).
S/MORRIS denied any allegations of inappropriate touching of V/KURTA, or member(s) of the CNA staff.

2. Following the attempted interview, RA and PA BLUE fingerprinted and
photographed S/MORRIS. S/MORRIS' fingerprints and three mugshot photographs
were transmitted via LiveScan under Transaction Control Number (TCN)
DCWA00000000543. A hard copy of S/MORRIS' fingerprints was printed, signed by
S/MORRIS and placed in the case notes section of the case file.

3. S/MORRIS was released to CAPT Will TRIPLETT, USN, Executive Assistant,
Director, Navy Staff at approximately 0852.


ENCLOSURE(S)
  (A) Military Suspect's Acknowledgement and Cleansing Waiver of
      Rights/22Sep16
  (B) DVD-R containing working copy of audio/video recording of
      S/MORRIS' interview/22Sep16
  (C) Interview of S/MORRIS by CAPT RUEST/IIJWIT6

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.

MORRIS000083

MORRIS000084

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE
## CONTROL: 25JUL16-DCWA-0248-8SNA

26SEP16

REPORTED BY: RACHEL MCGRANAGHAN, Special Agent
OFFICE:      RESIDENT AGENCY WASHINGTON DC

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE

MORRIS000084

MORRIS000085

## MILITARY SUSPECT'S ACKNOWLEDGEMENT AND CLEANSING WAIVER OF RIGHTS

Place: UWS CA Washington DC
Date: 22 SEP 16.

I, Trey Scott Harris, CAPT USN , have been
advised by SA Kathy Hilmanganan that I am
suspected of abusive sexual contact of Naela Mula and
Glodus Estella Mulinas

I have also been advised that:

(1) Any prior illegal admissions or other improperly obtained evidence which incriminated me
cannot be used against me in a trial by court-martial;

(2) I have the right to remain silent and make no statement at all;

(3) Any statement I do make can be used against me in a trial by court-martial or other judicial
or administrative proceeding;

(4) I have the right to consult with a lawyer prior to any questioning. This lawyer may be a
civilian lawyer retained by me at no cost to the United States, a military lawyer appointed to act as my
counsel at no cost to me, or both;

(5) I have the right to have my retained civilian lawyer and/or appointed military lawyer present
during this interview; and

(6) I may terminate this interview at any time, for any reason.

I understand my rights as related to me and as set forth above. With that understanding, I have
decided that I do not desire to remain silent, consult with a retained or appointed lawyer, or have a
lawyer present at this time. I make this decision freely and voluntarily. No threats or promises have
been made to me.

Signature :

Date & Time: 22 SEP 2016 ( 0319)

Witnessed:

At this time, I, N/A , desire to
make the following voluntary statement. This statement is made with an understanding of my rights as
set forth above. It is made with no threats or promises having been extended to me.

ENCLOSURE ( A

OPNAV Form 1.0( 7)

MORRIS000085

MORRIS000086



MORRIS000086

MORRIS000087

DATE/TIME: 11 JUL 16/ 1330

SUBJ: Interview with Captain Terry Morris

I interviewed Captain Terry Morris, with CDR Steve Obert present, regarding circumstances surrounding allegations of sexual harassment.

During the interview we discussed the command climate within NOOK. Captain Morris described the climate as good when he first arrived. The office was in a period of transition as 2 of 3 junior officers were PCS'ing and Captain Morris predecessor was only there for a short period of time. CNO Greenert requested for Captain Morris to take over and after CNO Richardson arrived NOOK was unknown to him and took several months for CNO Richardson to get a handle on NOOK responsibilities.

In November 2015, CNO decided to make significant changes to adjust the panel. This caused significant anxiety. However, he felt that he was helping the JO's who were PCS'ing- LCDR Raymond to get back to sea and LCDR Raymond to OLA. Captain Morris interviewed both members when they transferred and they seemed OK. No issues were brought to him, LCDR Raymond specifically said "Things are better than when I got here".

In early DEC 2015, he had to grease the skids to get new panel members on board by expediting the hiring process. CNO had a different mindset on what he wanted the panel members to do that was different than the past so there was anxiety/concern about the changes. This caused changes to the staff work.

Captain Morris ran into DNS at a function. DNS said that we are closing down your office. Captain Morris didn't know about it and he called Captain Papparo and he confirmed that the office would be shut down. During a CNO meeting, it was discussed that NOOK would be realigned under N002 since both do strategic planning and there was no need for 2 offices to do the same work. Captain Morris was directed to work with Dr. Leed.

The next day, he told Curt (CDR Larson) and Maria to come up some ideas and clearly define roles and responsibilities for Dr. Leed. There would be no requirements to Director or a Deputy, and the other billets were unknown. Maria was biggest concern because she was a civilian and would have to define duties in her PD. Captain Morris was sitting the LCDR and he asked Curt and Maria to come up with ideas for when he got back.

After Memorial Day, he met with Dr. Leed to discuss duties and responsibilities, remaining personnel and sun downing of the spaces. Dr. Leed expressed she didn't want all the people, just the EA and YN for office support. LCDR Mullen was already on loan to N002 because they were already short personnel and his job of hiring panel members was complete. He couldn't loan out LCDR Nikitin because she was the security manager.

Mrs. Kurta expressed, no less than 6 times, her concern about the new job. Captain Morris said her PD would need to be written very tightly. She came in and told him she would be the EA. He quoted her HR standards about transfer and that he didn't know what role she would fill.

MORRIS000087

MORRIS000088

CDR Larson was having trouble to get orders, so he was working back door. He was working on getting LCDR Nikitin the orders she desired to PERS-41, she was handpicked and what she wanted to do. He talked with PERS-41 (Brad Cooper) and discussed the transfer time, and told him Oct would have to be it because of sun downing the office. LCDR Nikitin's husband has some health issues and he offered assistance since her husband probably wouldn't be able to fly again.

He traveled to Newport in June and just before the July 4 holiday Mrs. Kurta came to him and said Dr. Leed wanted to see her. He thought this was great because Mrs. Kurta could talk about her roles and responsibilities with the new boss. Mrs. Kurta expressed that she didn't know her and didn't know anything about her. So he sat down with Mrs. Kurta and talked. Mrs. Kurta went to the meeting (think it was Friday) and Flag Sec called and said she was going to stay down end look at storage availability. Later that day he got a call from Dr. Leeds's deputy who said Mrs. Kurta was still there and they were going to take her to lunch if that was OK.

After the holiday weekend (July 4), VADM Thomas called and said a grievance had been filed. Captain Morris was unaware of details. He thinks the climate for sexual harassment is close to zero, there was no dating conversation, nothing brought to his attention. Didn't think it was an unfair work environment, hostile work environment or an inappropriate environment.

We discussed the difference between AO and Deputy treatment. Captain Morris said Deputy was like his XO, he had never done AO work and he didn't expect him to. CDR Zwolski was the O5 lead AO. The O4's split the workload amongst themselves. He never heard anyone say they worked harder than the other guy. Mrs. Kurta was the Executive Assistant and handled the normal EA roles.

With the move to NO0Z, Captain Morris developed a brief to provide to Dr. Leed on roles & responsibilities and Mrs. Kurta had asked him why her list of things was longer than the others. It was just Captain Morris' thoughts on who should do what. It was a conversation about the workload.

A previous interview had brought up a FITREP inequity. Captain Morris described the fitrep as his conversation to the board on an officers future potential for leadership and in the navy. It is his decision to give soft break out and observed versus not observed fitness report. And in his board experience, and observed report is always better than not observed.

We discussed PT and working hours. Normal hours were 0800-1630, military were allowed to PT during the day for 1 hour with a 1 hour lunch and this time could be combined. People shifted to uniform in the office, but they did wear uniforms. He was liberal with leave as long as 1 AO was in the office. CDR Larson was allowed to go home because of back issues when he was having spasms. Mrs. Kurta brought up if military should be gone to PT, Captain Morris said yes because they were military. She wanted to know why she couldn't – because she was a civilian.

No concerns were ever brought to him, with the exception of several weeks ago when Shelby (LCDR Nikitin) wanted to go on leave and the other AOs were gone also. He discussed the issue with her about staying late on Thursday coming into the office on Friday and then catching her flight. She never expressed concern and said OK.

MORRIS000089

Captain Morris was unaware of issues with the panel members. Exception- Mr. Sullivan couldn't get in touch with LCDR Nikitin when she was on leave or, when there was a voicemail outage.   Said needed to make sure Mr. Sullivan had numbers for Captain Morris.

Discussed a travel issue in Newport and where he and CDR Larson stayed out in town with panel.   He explained they stayed with the panel members and brought another AO up because they couldn't all fit in 2 cars. Additionally, bringing the AO up was good for professional development.

Discussed a lunch issue with the panel members. All panel members paid for their own lunch. Dr Mocondo (spelling) had breakfast with CNO and he forgot to give $10. He said he pay it back. Captain Morris explained they clearly understand the ethics violation and never tool gifts.

We also discussed interaction with CNA staff. Captain Morris explained he did not interact with CNA staff (exception occasional meeting with President or CEO). He never had a negative dealing with CNA staff nor was any concern ever brought to him.  He had routine dealing with security in and out of building but that was it. The cleaning was done after hours so he did not interact with these personnel. He did occasional see the common area cleaning people, and he was aware that Mrs. Kurta talked with these people because Mrs. Kurta spoke Spanish. Most of the cleaning people only spoke Spanish so he did not talk with them- a lot seemed to struggle to say help/how are you. Captain Morris said he is more uncomfortable with them because they don't speak English.  He has no recollection of touching shoulders, or brushing shoulders with anyone. He has no memory of any inappropriate touching. He would remember if he was told someone was uncomfortable.

DN5-2 did call and discuss YN2 professionalism. Captain Morris addressed the issue and that if YN2 had a problem with someone's work performance to bring to Captain Morris  and he would address.

The office spaces were all private offices.

Mrs. Kurta acted as the EA and carried out typical functions. Captain Morris is certain she would have told him is she was uncomfortable. The one instance he remembers is when Mrs. Kurta was standing in the doorway, and Captain Morris told her she looked shorted. She told him not to say that. And then followed him to the galley, where she again stated don't say that and don't joke in front of YN2 (because of his professionalism). Captain Morris told her that if YN2 was disrespectful she should correct him.


He believes he is fair, open and friendly the way he would be with any O5/O6. There was casual office communication and general conversation. Nothing inappropriate. Mrs. Kurta asked him about his boys and he asked her about her weekend.

He never asked her about her diet, she would volunteer that she was on a diet. He never commented on her weight, gaining or losing. He never commented on her clothes, unless she had a khaki clothes and then said she looked like the rest of them. Captain Morris said he never commented on Mrs. Kurta's make-up or haircut.

MORRIS000089

MORRIS000090

The office went to lunch for birthdays and Hail and Farewells. Last week, Mrs. Kurta asked when they were going out for his farewell because there was still money in the fund. He told her they would all get together for lunch at the Pentagon.

He stated he never remember touching anyone inappropriately. He remembers no instances during a fire drill or in an elevator. He said he would be aware if he was touching a woman. He doesn't think he ever hugged anyone. He might have hugged a guy that he ran into in the Pentagon that he goes way back with. He's not stand-offish, but he's not touchy.

He saw Maria every working day as she walked in about other stuff. He doesn't think she would have a problem telling him he did something wrong because she told him about other stuff she didn't agree with.

He is 100% sure he never put his hands on her waist. This didn't happen, never would. Mrs. Kurta rode with him to the Pentagon for sexual harassment training (~February) and it was just the two of them.

He never allowed her to get his coffee or wash his coffee cup even though she offered.

Mrs. Kurta gave him the name of her car guy when Captain Morris was looking to buy a car.

He thinks Maria had anxiety over moving to Pentagon as they had probably 4-6 conversations about it. She was frustrated because he could tell her what was going to happen with the move.

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

INVESTIGATIVE ACTION                                                    21SEP16

CONTROL: 25JUL16-DCWA-0246-8SNA

S/MORRIS, TERRY SCOTT/CAPT USN
  M/B/NOO6/T/264893199/07MAY65/FORT LAUDERDALE, FL

COLLECTION OF ARRESTEE DNA FOR CODIS

1. On 21Sep16, Reporting Agent (RA) briefed LCDR Ben ROBERTSON, JAGC USN,
Senior Trial Counsel, Navy District Washington (NDW) Region Legal Service
Office (RLSO) on the facts and circumstances of this case. After
considering the information provided by RA, LCDR ROBERTSON stated there was
probable cause to believe S/MORRIS committed the captioned offense of
abusive sexual contact.

2. On 22Sep16, RA collected a sample of S/MORRIS' DNA utilizing the USACIL
DNA Database Collection Kit Number 0053478. The privacy act statement and
gold notification card were provided to S/MORRIS at that time.

3. USACIL DNA Database Collection Kit Number 0053478 was placed in outgoing
mail on 22Sep16. A copy of the completed USAC DNA Database Collection Card
is attached hereto as Enclosure (A).

ENCLOSURE(S)
(A) USACID DNA Database Collection Card/22Sep16

REPORTED BY: RACHEL MCGRANAGHAN, Special Agent
OFFICE:      RESIDENT AGENCY WASHINGTON DC

WARNING
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE
ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED
WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE